**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VISTA HEALTHPLAN, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CEPHALON, INC., *et al.*, <br><br> Defendants. | Case No. 2:06-cv-1833 (MSG) <br> Honorable Mitchell S. Goldberg |

**MEMORANDUM IN SUPPORT OF END-PAYOR PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF PROPOSED SETTLEMENTS WITH ALL DEFENDANTS,
FOR CERTIFICATION OF SETTLEMENT CLASSES, AND FOR FINAL
<u>APPROVAL OF PLAN OF ALLOCATION</u>**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................ 1

II.     BACKGROUND ................................................................................. 4

    A.     The Plaintiffs' Claims ............................................................... 4

    B.     Brief Statement of the Procedural History of This Litigation .................. 5

    C.     The Negotiation of the Settlements and Their Terms ............................... 6

    D.     Preliminary Certification of the Settlement Classes, and
            Preliminary Approval of the Settlements and Authorization of
            Notice to the Class ................................................................... 8

          1.     The Preliminarily Certified Settlement Classes ........................... 8

          2.     Preliminary Approval of the Settlements and Authorization
               of Notice to the Class .................................................... 11

III.    NOTICE OF THE SETTLEMENTS AND REACTION OF THE CLASS ......... 12

    A.     The Notice Program Implemented Pursuant to the PAO ........................ 12

    B.     The Reaction of the Potential Class Members to the Notice of the
            Settlements ............................................................................ 15

IV.    THE SETTLEMENTS WARRANT FINAL APPROVAL UNDER THE
        FACTORS IDENTIFIED BY GIRSH, PRUDENTIOAL AND BABY
        PRODS ........................................................................................... 15

    A.     The Framework for Assessing A Settlement's Fairness,
            Reasonableness and Adequacy ................................................... 16

    B.     The *Girsh* Factors Support Approval of The Settlements ..................... 17

          1.     The Complexity, Expense, and Likely Duration of the
               Litigation ................................................................... 18

          2.     The Reaction of the Potential Class Members to the
               Settlements ................................................................. 18

          3.     The Stage of the Proceedings and the Amount of Discovery
               Completed .................................................................. 19

          4.     The Risks of Establishing Liability and Damages and Risks
               of Maintaining Class Certification Through Trial ..................... 20

5. The Ability of Defendants to Withstand a Greater Judgment...... 21

6. The Range of Reasonableness of the Settlement Fund In Light of the Best Possible Recovery and In Light of All the Attendant Risks of Litigation....................................................... 22

C. The Prudential and Direct Benefit Considerations Favor Approval........ 23

1. The maturity of the underlying substantive issues favors approval.................................................................................... 24

2. The outcome of claims by other classes and subclasses, the results achieved or likely to be achieved for other claimants and the results achieved by the settlement for Settlement class members favors approval .................................... 25

3. Potential Class Members have the right to opt-out of the Settlements....................................................................................... 26

4. Class members were fully advised of the Settlements' provision for attorneys' fees, which is subject to review and approval by the Court for reasonableness, thus favoring approval........................................................................................... 26

5. The procedure for processing individual claims under the Settlements is fair and reasonable ................................................ 27

6. The Degree of Direct Benefit Provided to the Class.................... 28

V. THE SETTLEMENT CLASSES PRELIMINARILY CERTIFIED BY THE COURT SHOULD BE GRANTED FINAL CERTIFICATION................. 31

A. The Standard Applicable to Certifying a Settlement Class .................... 31

B. The Requirements of Rule 23(a) are Satisfied ........................................ 32

1. Numerosity is Satisfied ................................................................ 33

2. Commonality is Satisfied.............................................................. 33

3. Typicality is Satisfied .................................................................. 34

4. Adequacy is Satisfied.................................................................... 35

C. The Requirements Of Rule 23(b)(3) Are Satisfied ................................. 36

1. Common Legal And Factual Questions Predominate for the State Antitrust Claims.................................................................... 36

          a.     Common Questions Also Predominate On The
Antitrust Impact Element Of Plaintiffs' Claims ............... 38

          b.     Common Issues Predominate With Regard to
Damages.......................................................................... 39

     2.     Common Questions Predominate For Unjust Enrichment
And State Antitrust/Consumer Protection Claims ....................... 41

D.     Rule 23(b)(3) Class Is Superior To Other Methods Of Adjudication...... 41

E.     This Court Should Appoint Interim Class Counsel as Class
Counsel ................................................................................................ 43

VI.     THE PLAN OF ALLOCATION SHOULD BE GRANTED FINAL
APPROVAL ................................................................................................ 44

VII.     CONCLUSION ................................................................................................ 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Am. Int'l Group Secs. Litig.*,
689 F.3d 229 (2nd Cir. 2012).........................................................................37

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................ *passim*

*In re Auto. Refinishing Paint Antitrust Litig.*,
2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ......................................................18

*Baby Neal v. Casey*,
43 F.3d 48 (3d Cir. 1994)........................................................................33, 35

*In re Baby Prods. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013)............................................................16, 24, 29

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006).........................................................................34

*Bell Atl. Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993)...........................................................................19

*In re Bulk (Extruded) Graphite Antitrust Litig.*,
2006 WL 891362 (D.N.J. Apr. 4, 2006) ......................................................33

*California v. Teva Pharma. Indus., Ltd.*,
No. 19-cv-3281 (E.D. Pa. Aug. 8, 2019) ..................................................2, 12

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013)..........................................................................32

*In re Cigna-American Specialty Health Admin. Fee Litig.*,
2019 WL 4082946 (E.D. Pa. Aug. 29, 2019) ........................................24, 42

*City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*
867 F. 3d 434 (3d Cir. 2017).........................................................................10

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005)....................................................................31, 37

*In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig.*
2019 WL 4645331 (E.D. Pa. Sept. 24, 20019) ...................................... *passim*

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ......................................................................................39

*In re Corel Corp. Inc. Securities Litig.*,
    293 F. Supp. 2d 484 (E.D. Pa. 2003) ...............................................................45

*Curiale v. Lenox Grp., Inc.*,
    2008 WL 4899474 (E.D. Pa. Nov. 14, 2008) ...................................................15

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    No. 05-cv-2237 (S.D.N.Y.) ...............................................................................45

*In re: Domestic Drywall Antitrust Litig.*,
    322 F.R.D. 188 (E.D. Pa. 2017) .......................................................................35

*In re Doryx Antitrust Litig. (Mylan Pharms., Inc., v. Warner Chilcott Public Ltd.)*,
    No. 12-cv-3824 (E.D. Pa.) ................................................................................45

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010) .............................................................................16

*F.T.C. v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ..............................................................................6, 7, 20

*In re Fasteners Antitrust Litig.*,
    2014 WL 285076 (E.D. Pa. Jan. 24, 2014) ................................................34, 35

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472 (W.D. Pa. 1999) ......................................................................35

*In re Flonase Antitrust Litig.*,
    951 F. Supp. 2d 739 (E.D. Pa. 2013) .......................................................*passim*

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.*,
    55 F.3d 768 (3d Cir. 1995) ...............................................................................15

*Georgine v. Amchem Prods.*,
    83 F.3d 610 (3d Cir. 1996) ...............................................................................41

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975) ....................................................................*passim*

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    934 F.3d 316 (3d. Cir. 2019) ...................................................................*passim*

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) .............................................................................39

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000)............................................................44, 45

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009)................................................................16, 36

*Krell v. Prudential Ins. Co. of Am. (In re Prudential)*,
    148 F.3d 283 (3d Cir. 1998).................................................................. *passim*

*In re Lidoderm Antitrust Litig.*,
    14-md-02521-WHO, Dkt. 670 (N.D. Cal.)........................................22, 23

*In re Linerboard Antitrust Litig.*,
    296 F. Supp. 2d 568 (E.D. Pa. 2003) ............................................18, 33, 35

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 374 (D.D.C. 2002)........................................................29

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993)........................................................40

*McDonough v. Toys R Us, Inc.*,
    638 F. Supp. 2d 461 (E.D. Pa. 2009) ............................................43

*Melhing v. N.Y. Life Ins. Co.*,
    248 F.R.D. 455 (E.D. Pa. 2008)....................................................44

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*,
    No.06-cv-52 (D. Del.)....................................................................45

*In re Miralax Antitrust Litig.*,
    No. 07-cv-142 (D. Del.)................................................................45

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016), *as amended* (Sept. 29, 2016)..................33, 38

*In re N.J. Tax Sales Certificate Antitrust Litig.*,
    750 F. Appx. 73 (3d Cir. 2018)....................................................23

*Nichols v. SmithKline Beecham Corp.*,
    2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ..................................29

*Pennwalt Corp. v. Plough*,
    676 F.2d 77 (3d. Cir. 1982)........................................................15

*In re Pet Food Products Liability Litig.*,
    629 F.3d 333 (3d Cir. 2010)........................................................24

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009)......................................................................40

*Phila. Elec. Co., et al. v. Anaconda Am. Brass Co.*,
   43 F.R.D. 452 (E.D. Pa. 1968)...................................................................34

*In re Processed Egg Prods. Antitrust Litig.*,
   2016 WL 3584632 (E.D. Pa. June 30, 2016).................................32, 37, 39

*In re Remeron End-Payor Anti-Trust Litig.*,
   2005 U.S. Dist. LEXIS 27011 (D.N.J. Sept. 13, 2005) ..............................43

*Rossi v. Standard Roofing, Inc.*,
   156 F.3d 452 (3d Cir. 1998).......................................................................40

*In re Schering-Plough Corp.*,
   2012 WL 1964451 (D.N.J. May 31, 2012) ..................................................44

*Sheinberg v. Sorensen*,
   606 F.3d 130 (3d Cir. 2010).......................................................................36

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   299 F.R.D. 555 (E.D. Tenn. 2014).......................................................11, 32

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir.2011)................................................................ *passim*

*In re Tricor Direct Purchaser Antitrust Litig.*,
   No. 05-cv-00340 (D. Del.) ....................................................................23, 45

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ...............................................................................37

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
   2015 WL 3623005 (E.D. Pa. June 10, 2015)..........................................6, 32

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
   246 F.R.D. 349 (D.D.C. 2007)....................................................................29

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002)....................................................................37

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D.Del. 2002) *aff'd*, 391 F.3d 516 (3d Cir. 2004).....................*passim*

*In re Wellbutrin XL Antitrust Litig.*,
   No. 08-cv-2431 (E.D. Pa.) ................................................................*passim*

*White v. Experian*,
    2018 WL 1989514 (C.D. Cal. Apr. 6, 2018) ...........................................................32

**State Cases**

**Rules**

FED. R. CIV. P. 23 .................................................................................... *passim*

FED. R. CIV. P. 23(a) ...............................................................................32, 33

FED. R. CIV. P. 23(a)(2) ................................................................................33

FED. R. CIV. P. 23(a)(3) ................................................................................34

FED. R. CIV. P. 23(a)(4) ...........................................................................35, 36

FED. R. CIV. P. 23(b)(3) ......................................................................... *passim*

FED. R. CIV. P. 23(e) .....................................................................................1, 2

FED. R. CIV. P. 23(e)(1) ...........................................................................11, 31

FED. R. CIV. P. 23(e)(1)(B) ...........................................................................3

FED. R. CIV. P. 23(e)(2) ......................................................................... *passim*

FED. R. CIV. P. 23(e)(3) ................................................................................17

FED. R. CIV. P. 23(g) ...............................................................................36, 43

FED. R. CIV. P. 23(g)(1)(A) ...........................................................................43

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs Shirley Panebianco, Vista Healthplan, Inc. (n/k/a Coventry Health Care of Florida, Inc.), District Council 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission ("End-Payor Plaintiffs," "End-Payors" or "Plaintiffs") submit this Memorandum of Law in support of their Motion for Final Approval of Settlements with Cephalon, Mylan and Ranbaxy,[1] for Certification of Settlement Classes and Final Approval of the Plan of Allocation (the "Motion").[2]  For the reasons set forth below, the Settlements merit final approval, the Settlement Classes qualify for certification and the Plan of Allocation merits final approval.

## I.    INTRODUCTION

The Settlements presented for final approval, achieved with Defendants Cephalon, Mylan and Ranbaxy after over 12 years of hard fought litigation and preliminarily approved on August 8, 2019,[3] together will provide a total of $65,877,600 in relief to the proposed Settlement Classes of indirect purchasers of Provigil and its generic equivalent, modafinil.[4]  In exchange for Plaintiffs' dismissal of the antitrust, consumer protection and unjust enrichment claims  that they

---

[1] As used herein "Cephalon" refers collectively to (a) Cephalon, Inc. ("Cephalon"); (b) Barr Laboratories, Inc. ("Barr"): and (c) Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc. (collectively "Teva"). "Mylan" refers collectively to Mylan Inc., (formerly known as Mylan Laboratories Inc.) and Mylan Pharmaceuticals Inc.  "Ranbaxy" refers collectively to Sun Pharmaceutical Industries, Ltd. as successor in interest to Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. "Defendants" as used herein refers to Cephalon, Mylan and Ranbaxy.

[2] Plaintiffs also seek an award of attorneys' fees and service awards for each of the class representatives.  Plaintiffs' application and memorandum in support of same will be filed this date in accordance with this Court's August 8, 2019 Order Granting Preliminary Approval to the Settlements, Preliminary Certification of the Settlement Classes and Authorizing the Dissemination of Notice to the Members of the Settlement Classes. ECF No. 592 ("PAO").

[3] ECF No. 592, ¶¶ 10-11.

[4] The settlement terms are memorialized in the Settlement Agreements entered into by the parties, copies of which are attached to the Declaration of Joseph H. Meltzer ("Meltzer Decl.") filed herewith in support of this Motion, as Exhibits 1, 2 and 3.  All defined terms herein shall have the same meanings as set forth in the Settlement Agreements.

asserted against Defendants[5] on behalf a putative class of consumer and Third Party Payors ("TPPs") who paid for Provigil and/or modafinil in 27 states and the District of Columbia, Plaintiffs secured agreements for settlement payments of:

- $48 million from Cephalon;[6]

- $14,377,600 from Mylan; and

- $3.5 million from Ranbaxy.

This Court granted preliminary approval to these Settlements having found that they met the requirements of Rule 23(e) for preliminary approval and authorization of Notice of the Settlements to potential Class Members.[7]  The Court also preliminarily certified the Settlement Classes.[8]  Notice has since been disseminated in accordance with the Notice Program approved by the Court.[9] To date, the response of the Class Members to the Notice, which was disseminated by mail sent to 1.2 million potential Class Member addresses and published in targeted magazines and digital media, has been overwhelmingly positive.  As of the date of this filing,

---

[5] Cephalon, Mylan and Ranbaxy deny any allegations of unlawful or wrongful conduct and believe they have meritorious defenses to this litigation.

[6] In addition to this $48 million payment to settle the class claims, a group of over forty large health plans (the "Settling Health Plans" or "SHPs") elected in 2015 to negotiate and ultimately settle separate from the class in exchange for a $77 million settlement payment from Cephalon.

[7] ECF No. 592, ¶¶ 10-13.

[8] *Id.* at ¶¶ 2-9. On the same date, this Court also granted preliminary approval to a settlement achieved by the State of California (the "CAAG Settlement") for California residents who purchased Provigil, Nuvigil or modafinil between June 24, 2006 and December 31, 2012.  This Court further authorized a coordinated notice program for these Settlements and the CAAG Settlement.  *California v. Teva Pharma. Indus., Ltd*., No. 19-cv-3281 (E.D. Pa. Aug. 8, 2019; ECF No. 8) ("California Settlement").

[9] *See* the December 13, 2019 Declaration of Eric Miller Regarding (A) Mailing of the Notice and Proof of Claim and Release; (B) Publication of Summary Notice; and Publication of Summary Notice; and (C) Report on Requests for exclusion Received to Date (the "Miller Decl.").  Mr. Miller is a Senior Vice President at A.B. Data, Ltd., the firm appointed by the Court to serve as Settlement Administrator and to assist Class Counsel in disseminating Notice. PAO at ¶¶ 13 & 14. Mr.  Miller's Declaration in support of final approval of the Settlements is attached to the Meltzer Decl. as Exhibit 4.

over 25,000 Class Members have already submitted claim forms,[10] only 17 have opted out and none have objected to the Settlement.[11]

To obtain this Court's PAO directing that Notice of the Settlements be disseminated to members of the putative Settlement Classes, Plaintiffs showed, as required by Rule 23(e)(1)(B), that this Court would likely be able to:

> (1) approve the [settlement] proposal under Rule 23(e)(2); and
>
> (2) certify the class for purposes of judgment.

FED. R. CIV. P. 23 (e)(1)(B).  *See also* PAO at ¶¶ 3, 10.  Plaintiffs submit that when analyzed under the Third Circuit framework for final approval of class action settlements, which considers the factors set forth *Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975) and *Krell v. Prudential Ins. Co. of Am. (In re Prudential)*, 148 F.3d 283 (3d Cir. 1998), the Settlements readily meet Rule 23(e)(2)'s test for fairness, reasonableness and adequacy.  *See In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 322 (3d. Cir. 2019) (stating that the factors to be considered in determining whether to approve a class action settlement are set forth in *Girsh* and *Prudential*).  Further, the record presented in support of final approval also confirms this Court's conclusion at the time of preliminary approval that certification of the Settlement Classes is warranted.  Each of the requirements of Rule 23 remains satisfied such that final certification of the Settlement Classes is appropriate.

Accordingly, Plaintiffs respectfully request that the Court grant final approval to the Settlements, final certification to the Settlement Classes, final approval to the Plan of Allocation, and enter the proposed Order Granting End-Payor Plaintiffs' Motion for Final Approval of Class Action Settlements submitted herewith.

---

[10] The deadline to file claim forms is January 15, 2020.

[11] Miller Decl. at ¶¶ 22-23.

## II.      BACKGROUND

### A.      The Plaintiffs' Claims

In 2006, Plaintiffs, individually and as representatives of all persons who paid for Provigil and/or modafinil in 27 states and the District of Columbia, claimed that Defendants violated the antitrust, consumer protection and unjust enrichment laws of the included states by participating in an unlawful "reverse payment" scheme and related fraudulent conduct concerning Provigil, a wakefulness promoting agent used to treat narcolepsy and other sleep disorders.

Plaintiffs alleged that Cephalon, Inc. obtained its patent for Provigil by defrauding the U.S. Patent and Trademark Office (the "PTO").  Plaintiffs further alleged that Defendants Mylan, Barr, Teva and Ranbaxy (the "Generic Defendants"), each of which had challenged Cephalon's patent under certain provisions of the Hatch-Waxman Act, settled the resultant patent infringement actions while summary judgment was still pending on terms that amounted to an unlawful pay-for-delay agreement.  In particular, Cephalon, Inc. and the Generic Defendants agreed to settle the patent infringement litigation for over $300 million in payments to the Generic Defendants, in the form of intellectual property agreements (alleged to be sham agreements) and supply contracts for modafinil, the active ingredient in Provigil, at an exorbitant cost.  In exchange, the Generic Defendants would not bring their generic modafinil products to market until 2012, thereby depriving the market of generic competition for six years.

Plaintiffs alleged that Cephalon's fraud on the PTO and the pay-for-delay deals with the Generic Defendants delayed generic competition for six years.  During that time, Cephalon continued charging inflated, monopoly prices for Provigil resulting in damages to consumers and

health plans in the form of overcharges and unlawfully inflated prices for Provigil and/or modafinil.  Plaintiffs sought to recover such damages in this litigation.

## B.  Brief Statement of the Procedural History of This Litigation

The cases consolidated in this action,[12] were reassigned to this Court in 2009, and were prosecuted together in the Amended Consolidated Complaint filed in August 2009.[13]  A detailed description of the litigation, which spanned over some twelve years, is set forth in greater detail in the Declaration of Joseph Meltzer filed in support hereof.  As demonstrated therein, Plaintiffs vigorously prosecuted this action, conducting voluminous discovery, which included reviewing approximately five million pages of documents produced by Defendants, taking over 180 depositions, defending the depositions of all five Plaintiffs, submitting highly qualified reports from eight separate experts and participating in extensive motion practice and lengthy court hearings concerning discovery, class and dispositive issues, and related ancillary proceedings.[14]

Proceedings on the merits followed after Cephalon and the Generic Defendants unsuccessfully moved to dismiss the Complaint in its entirety.[15]  The Parties sought summary judgment with respect to certain claims and/or elements of the claims in motions filed in 2013. After briefing and argument on those motions was completed, on March 13, 2014, the Court issued an opinion granting in part and denying in part End-Payors' motion and, on June 23, 2014, granted Defendants' motions on End-Payors' allegations of an overall conspiracy.[16]

---

[12] By Order dated August 8, 2006 (No. 06-cv-1833, ECF No. 21), the court appointed Kessler Topaz Meltzer & Check, LLP, Spector Roseman & Kodroff, P.C., and Criden & Love, P.A. as Interim Class Counsel to conduct the litigation on behalf of the Classes.

[13] ECF No. 75.

[14] Meltzer Decl. ¶¶ 10-27.

[15] *See* ECF No. 261 (March 29, 2010).

[16] ECF Nos. 285, 286, 366, 367.

Separately, on or about April 4, 2014, Defendants filed three motions for summary judgment on End-Payors' claims relating to *F.T.C. v. Actavis, Inc.,* 133 S. Ct. 2223, 2237 (2013), a U.S. Supreme Court decision analyzing pay-for-delay agreements under antitrust laws.[17]   On January 28, 2015, the Court denied Defendants' motions.[18]   Mylan subsequently filed a motion for reconsideration that was opposed by End-Payors and denied by the Court on March 27, 2015.[19]

On May 12, 2014, End-Payors filed their motion for class certification.[20]   After briefing on the motion was completed, the Court held a hearing on March 24 and 25, 2015 and heard final arguments on May 6, 2015.  The Court denied the motion, focusing on Plaintiffs' inability, in a litigation context, to ascertain absent class members and to remove uninjured persons on a classwide basis.  *Vista Healthplan, Inc. v. Cephalon, Inc.,* 2015 WL 3623005, at *1 (E.D. Pa. June 10, 2015) ("*Class Cert. Opinion*").

### C.      The Negotiation of the Settlements and Their Terms

Each of the Settlement Agreements were arrived at only after extensive negotiations, during which the strengths and weaknesses of the respective parties' positions were thoroughly discussed, evaluated, and negotiated.  The negotiations started during a January 2014 multi-day mediation conducted by Magistrate Judge Strawbridge and special masters Robert Heim and Lloyd Constantine. There were intermittent settlement discussions over the following months, with the negotiations becoming more frequent and focused as the class certification hearing approached.[21]

---

[17] ECF Nos.  295, 302, 307.

[18] ECF No. 389.

[19] ECF No.  418.

[20] ECF No. 337.

[21] Meltzer Decl. ¶¶ 28-31.

Further settlement negotiations occurred after discovery was completed, allowing Class Counsel to continue meaningful discussions after having reviewed millions of pages of documents, taking hundreds of depositions, evaluating comprehensive expert reports and financial data, as well as this Court's prior rulings on summary judgment and the impact of the Supreme Court's decision in *F.T.C. v. Actavis, Inc.*, 133 S. Ct. at 2237.[22]

Plaintiffs and Mylan announced that they had reached a settlement on March 24, 2015, during oral argument on class certification. Class Counsel delayed seeking preliminary approval of that settlement with Mylan because it believed a settlement with Cephalon was imminent, resulting in significant cost savings if both settlements could be administered together.[23]

Plaintiffs and Cephalon orally agreed to a settlement in October 2015, which was memorialized in a binding and enforceable Memorandum of Understanding ("MOU") in December 2015.  The parties agreed the MOU would be followed up with separate, final settlement agreements with the Plaintiffs and a separately represented group of large health insurers (referred to as the "Settling Health Plans" or "SHPs").[24]  However, execution of final settlement agreements was delayed because United Healthcare Services, Inc. ("United Healthcare"), one of the SHPs that had agreed to settle separately with Cephalon, tried to renounce its agreement to settle leading to litigation in which Cephalon and the End-Payor Plaintiffs sued United Healthcare to enforce the MOU. Cephalon prevailed at trial and the parties thereafter resolved their dispute after United Healthcare filed an appeal.[25]

---

[22] Meltzer Decl. ¶ 30.

[23] *Id.* ¶ 31.

[24] *Id.* ¶ 32.

[25] *Id.* ¶¶ 32-36.

Plaintiffs and Cephalon ultimately executed final settlement documents, in the form of a May 2018 Class Settlement Agreement that excluded United Healthcare from the Settlement Classes due to its ongoing dispute.[26]   As a result the United Healthcare dispute, the final Settlement Agreement between Plaintiffs and Ranbaxy, was also delayed.   That Settlement Agreement was signed in June 2018.[27]

The Settlement with Cephalon is for $48 million.   The Settlement with Mylan provides $14,377,600.   And the Settlement with Ranbaxy is for $3.5 million. The Settlements total $65,877,600, plus accrued interest.

### D.   Preliminary Certification of the Settlement Classes, and Preliminary Approval of the Settlements and Authorization of Notice to the Class

#### 1.   The Preliminarily Certified Settlement Classes

In its August 8, 2019 PAO, this Court certified the following Settlement Classes for settlement purposes only:

#### I.   State Antitrust/Consumer Protection Class

> All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds between June 24, 2006 and August 8, 2019.

#### II.   State Unjust Enrichment Class

> All persons or entities in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont,

---

[26] *Id*. ¶¶ 35and 37.

[27] *Id*. ¶ 37.

West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds between June 24, 2006 and August 8, 2019.

Excluded from the Settlement Classes are the following:  (i) the Defendants and their respective subsidiaries, affiliates and employees; (ii) all governmental entities (except for government funded employee benefit plans); (iii) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug purchases; (iv) insured individuals who purchased only generic modafinil (not branded Provigil) pursuant to a fixed co-pay applicable to generic drugs; (v) United Healthcare Services, Inc. ("United Healthcare"), including its subsidiaries; and (vi) fully-insured health plans, i.e., plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members.  In addition, the SHPs are excluded from the Cephalon Settlement.

As explained in the submissions in support of preliminary approval,[28] the Settlement Classes' exclusion of (1) Insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices; and (2) Insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs is a definitional feature that addresses the Court's concerns in declining to certify a litigation class about the inclusion of uninjured persons or entities.[29]  These exclusions are specified on the Consumer Claim form, and in order to participate in the Settlements, class members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions.[30]  This

---

[28] *See* ECF No. 585 at 8-9; 28; Appendix A.

[29] *See Class Cert. Opinion,* 2015 WL 3623005, at *19 (concluding that Plaintiffs could not demonstrate such impact on a class-wide basis because "a significant number of uninjured class members remain within the class definition" and to identify them "would require a fact-intensive, individualized analysis of the contracts between various entities and the consumer, as well as the purchasing history of a particular consumer.")

[30] *See* Miller Decl., Exhibits C and D.

process properly serves to carve out uninjured individuals and establish which class members fall within the Settlement Classes' definitions. *See City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.* 867 F. 3d 434, n.4 (3d Cir. 2017).

Similarly, as defined, the Settlement Classes preliminarily certified by the Court specifically condition class membership on a Provigil or modafinil "purchase" and requires claiming class members to verify that they paid for such purchase(s).[31]  Thus, the Settlement Classes do not include consumers with no out of pocket payment for Provigil or modafinil, which was another concern of the Court in denying certification to a litigation class.[32]

The record presented in support of preliminary certification of the Settlement Classes also included the expert report of W. Paul DeBree, an expert in the Pharmacy Benefit Manager ("PBM") Industry, which addressed the Court's concerns that the proposed litigation class included unimpacted entities in the form of TPPs that had capitation agreements with pharmacies (meaning they paid only a fixed amount per prescription).[33]  Mr. DeBree explained that capitation agreements have not existed in the TPP marketplace for over a decade, thus the very existence of TPP class members with such plans is very unlikely.[34]  Similarly, Mr. DeBree explained that it was unlikely that another category of concern to the Court, *i.e.* TPPs that pay more for generic than branded Provigil due to an aggressive co-payment structure, exist in any

---

[31] *Id.*

[32] *See Class Cert. Opinion*, 2015 WL 3623005, at *20.

[33] The Expert Report of W. Paul DeBree (the "DeBree Report") was attached as Ex. 11 to the Declaration of Joseph H. Meltzer in support of preliminary approval of the Settlements, preliminary certification of the Settlement Classes and dissemination of Notice (the Meltzer PA Decl."), ECF No. 586.

[34] DeBree Report ¶ 35.  Moreover, the definition of the Settlement Classes differed from that proposed for a litigation class in that it had no exclusion for such capitated plans (should any exist). Thus, if a TPP did have such a plan and can document qualifying payments, it is within the Settlement Classes without reference to or the need for identification of the capitation plan.

number because the high cost of Provigil and the significant disparity between brand and generic Provigil prices make plans that so provide extremely unlikely.[35]

In sum, as happened following the denial of class certification in *In re Skelaxin (Metaxalone) Antitrust Litig.,* 299 F.R.D. 555 (E.D. Tenn. 2014) -- decision this Court relied upon in denying certification to a litigation class here -- this Court found preliminary certification of the Settlement Classes to be appropriate based upon the enhanced record Plaintiffs presented which contained, *inter alia*, new expert opinions that resolved the concerns that had precluded certification of a litigation class.  *See In re Skelaxin,* No. 12-md-2343, Dkt. 950 (E.D. Tenn. Dec. 22, 2015) ("Skelaxin").

### 2.      Preliminary Approval of the Settlements and Authorization of Notice to the Class

This Court's PAO also authorized notice to be disseminated to the potential Class Members to advise them of the terms of the proposed Settlements and their rights related thereto. In determining that such notice was warranted, this Court determined, as is required by Rule 23(e)(1), that the Settlements fell within the range that the Court would likely be able to approve based upon the consideration of the factors specified in Rule 23(e)(2).  The Notice Program authorized by the Court included direct mail notice to members of the Settlement Classes who could reasonably and economically be identified, augmented by publication in print media and digital media placements.[36]

As to the form of Notice, Plaintiffs and the California State Attorney General requested that the Court permit them to coordinate notice with the California State Attorney General which had sought, and was granted, preliminary approval of its own separate $69,000,000 settlement

---

[35] DeBree Report ¶¶ 46, 47.

[36] PAO, ¶ 12.

(of which $25,250,000 will be distributed to eligible California consumers) with Teva Pharmaceuticals Industries, Ltd. and Cephalon, Inc. for the same violations of state and federal antitrust and consumer protection laws relating to the sale and pricing of Provigil and Nuvigil ("CAAG Settlement").[37]

The PAO also appointed A.B. Data to be the Settlement Administrator to assist Class Counsel in dissemination the Notice and distribution of the Settlements (should they be finally approved), approved the Escrow Agreements for the banks holding the settlement funds and preliminary approved the Plaintiffs' Plan of Allocation.[38]  The PAO also established the schedule for further proceedings in connection with the consideration of final approval of the Settlements, including deadlines for filing opt outs and objections and setting  February 26, 2020 for the final Fairness Hearing.[39]

## III.    NOTICE OF THE SETTLEMENTS AND REACTION OF THE CLASS

### A.    The Notice Program Implemented Pursuant to the PAO

In accordance with the Court's August 8, 2019 PAO, the Notice Program approved was implemented by A.B. Data under the supervision of Class Counsel.  As described in the Miller Declaration, the Notice Program consisted of:

    a.    Direct Notice to potential Class Members identified through subpoenas to 25 providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies;

    b.    Direct notice to potential members of the Settlement Class identified through the A.G. Provigil Settlement;

    c.    Publication notice in national consumer magazines;

---

[37] PAO ¶ 12 and n.2. *See also* California Settlement, ECF No. 2 and 8.

[38] PAO ¶¶ 13-16.

[39] Id. at ¶¶ 20-24.

    d.       Internet banner and newsfeed ads on multiple networks, including social media and targeted websites;

    e.       Distributing notice via PR Newswire's US1 Newsline;

    f.       Developing and launching a dedicated informational website for the Settlement at ProvigilSettlement.com (the "Settlement Website"); and

    g.       Establishing a dedicated toll-free telephone number with an interactive voice response ("IVR") system and live operators.[40]

In accordance with the deadlines established in the PAO, on August 22, 2019, A.B. Data commenced issuance of notice via USPS First-Class Mail to the 42,793 consumer names and addresses that were identified in the claim records from administering the earlier Attorney General Provigil settlement and 38,732 potential TPP Class Members included in A.B. Data's proprietary TPP Mailing List.[41]  During the period that A.B. Data was preparing such notice,[42] A.B. Data also assisted Class Counsel in compiling a list of 25 large pharmacies and pharmacy benefits managers ("PBMs") for issuing subpoenas requesting the names and addresses of persons who purchased Provigil or modafinil for the purposes of sending out Notice.[43]  Class Counsel began issuing those subpoenas on August 13, 2019, and, with the assistance of the California Attorney General ("CAAG") and A.B. Data, followed up with the pharmacies and PBMs to encourage compliance with the subpoenas.[44]  Ultimately, this subpoena process yielded electronic lists containing in excess of 5.7 line of data including names and addresses of potential

---

[40] Miller Decl. at ¶ 7.

[41] *Id.*  A.B. Data's TPP mailing list is compiled using membership listings and existing databases from publicly available sources including U.S. Department of Labor Form 5500 filings and the Pharmacy Benefit Management Institute. *Id.*

[42] A.B. Data, in cooperation with both Lead Counsel for this Action and the California Attorney General office ("CAAG"), formatted and prepared the combined Notices and Claim Forms for direct mail to potential Class Members and potential eligible members of the CAAG Settlement. Copies of the Notice and Claim Forms are attached to the Miller Decl. as Exhibits C and D.  *Id.* at ¶ 6.

[43] *Id.* at ¶¶ 8 and 9.

[44] *Id.* at ¶ 10.

Class Members which A.B. Data used to mail over 1.1 million Notice Packets to potential Class Members.[45]

Also, pursuant to the Notice Program approved by the Court, A.B. Data developed and effectuated the publication of the approved summary notice in September and October in national consumer magazines, including *Better Homes and Gardens*, *People* and *Time* to reach potential Class Members.[46]   Additionally, beginning on September 4, 2019, A.B. Data coordinated internet banner ads and newsfeed ads to appear on websites/networks and social media (including Facebook, Google Networks, Google AdWords, YouTube and Pinterest) for 60 days which, when clicked, directed potential Class Members to the Settlement's Website.[47] More than 218 million digital impressions were delivered to potential Class Members through this digital media campaign.[48]  A.B. Data also effectuated a digital ad campaign on September 9, 2019 to reach TPPs and other entities that may be potential Class Members.[49]

Potential Class Members seeking more information about the Settlements were able to obtain such information through the Settlement Website, ProvigilSettlement.com, established by A.B. Data.[50] The website, which was operational beginning August 22, 2019, includes general information regarding this Action, and its current status, the deadlines for filing claims, exclusions and objections, frequently asked questions and answers, copies of Settlement documents, and the date and time of the Court's Final Approval Hearing.[51]   The website also

---

[45] *Id*. at ¶ 12.

[46] *Id*. at ¶ 13. In addition, A.B. Data effectuated the publishing of the Summary Notice on September 4, 2019, *via* PR Newswire using the US1 National distribution list. *Id.* at 16.

[47] *Id*. at ¶ 14.

[48] *Id*.

[49] *Id*. at ¶ 15.

[50] *Id*. at ¶¶ 17-18.

[51] *Id*..

provides similar information in relation to the CAAG Settlement.[52]   Likewise, information was made available to Class Members through a case-specific, toll-free telephone helpline established by A.B. Data on or about August 22, 2019.[53]

### B.   The Reaction of Class Members to the Notice of the Settlements

To date, the reaction of Class Members to the Settlements in response to the Notice has been overwhelmingly positive.   The deadline for opt outs (December 6, 2019) has passed, and there are only seventeen requests to opt out.[54]   As of this date, no objections to the Settlements have been filed.[55]   In contrast, although the deadline for filing claims is not until January 15, 2020, over 25,000 Class Members have already expressed their support and interest in participating in these Settlements by filing their claims.[56]

## IV.   THE SETTLEMENTS WARRANT FINAL APPROVAL

"There is a strong judicial policy in favor of the voluntary settlement [of] agreements." *Curiale v. Lenox Grp., Inc.,* 2008 WL 4899474, at *5 (E.D. Pa. Nov. 14, 2008) (*citing Pennwalt Corp. v. Plough,* 676 F.2d 77, 79-80 (3d. Cir. 1982) (holding that voluntary settlement agreements are "specifically enforceable and broadly interpreted").   This is particularly so, "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.*, 55 F.3d 768, 784 (3d Cir. 1995) (citations omitted).   As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year

---

[52] *Id*.

[53] *Id*. at ¶¶ 19-20.

[54] Miller Decl. at ¶¶ 21 -22.  Of these seventeen, at least eight are individuals who do not think they are part of the Settlement Classes because they fall within an exclusion or do not want to file a claim. As such, the number of actual opt outs is closer to ten.

[55] The deadline for objections is January 15, 2020. If any objections come in after the filing of this brief, Plaintiffs will, of course, address them our brief responding to objections which is due February 14, 2020.

[56] Miller Decl. at ¶ 23.

litigation.'" *In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig.* 2019 WL 4645331, at

*10 (E.D. Pa. Sept. 24, 20019) (quoting *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d

Cir. 2013) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004)).

As the Third Circuit recently explained, it has:

> identified two opposing interests a district coufrt must weigh when reviewing
> motions for settlement-only class certification and approval of the settlement.
> First, we favor the parties reaching an amicable agreement and avoiding
> protracted litigation. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d
> 516, 535 (3d Cir. 2004). We do not wish to intrude overly on the parties' hard-
> fought bargain. *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593-95 (3d Cir.
> 2010). A district court thus is to presume a settlement is fair if "(1) the
> negotiations occurred at arms length; (2) there was sufficient discovery; (3) the
> proponents of the settlement are experienced in similar litigation; and (4) only a
> small fraction of the class objected." *NFL Concussion Litig.*, 821 F.3d at 436. At
> the same time, a district court has an obligation as a fiduciary for absent class
> members to examine the proposed settlement with care. *See, e.g.*, *Warfarin
> Sodium*, 391 F.3d at 535.

*In re Google*, 934 F.3d at 326. Here, the Settlements are entitled to an initial presumption of

fairness in the first instance because they are the product of arm's length settlement negotiations

conducted by experienced counsel after extensive discovery and not one potential Class Member

has objected to the Settlements as of the date of this filing.  Further, when examined "with care"

in accordance with the Third Circuit's guidance for evaluating class action settlements it is

apparent that the Settlements merit final approval.

A.     **The Framework for Assessing A Settlement's Fairness, Reasonableness and
       Adequacy**

A district court may approve the settlement of a class "only on finding that it is fair,

reasonable and adequate." *See* FED. R. CIV. P. 23(e)(2); *Sullivan v. DB Invs., Inc.,* 667 F.3d 273,

295 (3d Cir.2011); *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 258 (3d Cir. 2009).  Rule

23(e)(2), as amended effective December 1, 2018, sets forth the considerations that should guide

a district court's determination in this regard.[57]   However, the Advisory Committee Notes to the

amended rule also make clear that the factors enumerated in the rule are not intended to displace

those established by the circuit courts to determine whether a settlement is fair, reasonable and

adequate.[58] Accordingly:

> the Third Circuit continues to advise district courts to assess the fairness,
> reasonableness, and adequacy of a settlement applying the *Girsh* factors, the
> relevant *Prudential* considerations, and the *Baby Products* direct benefit
> consideration. *See Google*, *934 F.3d at 329* ...with the understanding that these
> factors and considerations amply address "the core concerns and procedure and
> substance" listed in the amended Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2) advisory
> committee's notes (2018 amendments).

*In re Comcast*, 2019 WL 4645331, at *11 n.10 (citing *In re Google*, 934 F. 3d at 329).  Here the

*Girsh* and *Prudential* factors, as well as the *Baby Products* direct benefit considerations, amply

support approval of the Settlements as fair, reasonable and adequate.

### B.      The *Girsh* Factors Support Approval of The Settlements

*Girsh* requires that courts consider the following in assessing whether a proposed

settlement merits approval: (1) the complexity, expense and likely duration of the litigation; (2)

the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of

discovery completed; (4) the risks of establishing liability; (5) the risk of establishing damages;

---

[57] Rule 23(e)(2) identifies the following considerations:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

> (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

> (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

[58] Rather the factors listed in the rule are intended to "focus the court and lawyers on the core concerns...that should guide the decision whether to approve the proposal."  FED. R. CIV. P. 23(e)(2) advisory committee notes (2018 amendments).

(6) the risks of maintaining the class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[59]   Together, these factors weigh in favor of approval.

### 1. The Complexity, Expense, and Likely Duration of the Litigation

"This factor 'captures the probable costs, in both time and money, of continued litigation.'"   *In re Comcast,* 2019 WL 4645331, at *12 (*quoting Warfarin,* 391 F.3d at 535-36 (*quoting Cendant*, 264 F.3d at 233)).   Notably, it is well recognized that antitrust cases, such as this one, are particularly complex making them among the most lengthy and expensive to prosecute.  *See id.* (*citing In re Auto. Refinishing Paint Antitrust Litig.,* 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008); *In re Linerboard Antitrust Litig.,* 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)). This is demonstrably the case here, where the prosecution of the action has already spanned over twelve years. Continued prosecution of the claims, even following the denial of class certification, would have necessarily required a lengthy trial, preceded by complicated and time consuming pretrial proceedings addressing, *inter alia*, Daubert and *in limine* motions. The trial itself would likely span many weeks and be expensive, involving not only fact witnesses but also the presentation of many experts at substantial cost.   Accordingly, the complexity, length and likely duration of this action weighs heavily in favor of approving the Settlements.

### 2. The Reaction of the Potential Class Members to the Settlements

The reaction of the potential Class Members to the proposed Settlements reflects strong support, which is the focus of the second *Girsh* factor. *See In re Comcast,* 2019 WL 4645331, at

---

[59] 521 F.2d at 157.

*12 ("The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.' "*Warfarin,* 391 F.3d at 536 (*quoting Prudential,* 148 F.3d at 318)). As noted above, in response to the over 1.2 million direct notice packages mailed and extensive publication and internet notice program, no objections have been received[60] and only 17 potential class members have opted out.[61]   In contrast, although the claims deadline is not until January 15, 2020, over 25,000 Class Members have already filed their claims.   The minimal number of opt-outs and objectors is indicative of the type of positive reaction that courts in this circuit readily find supports approval of a settlement.   *See, e.g., Prudential,* 148 F.3d at 318 (affirming the district court's conclusion that the reaction of the class was favorable when 19,000 out of 8 million of the class members opted out and 300 objected); *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir. 1993) (concluding that the "small proportion of objectors does not favor derailing settlement"); *In re Comcast,* 2019 WL 4645331, at *20 (concluding that the reaction of the class was overwhelmingly positive and supported approval where there were 59 opt outs and four objections from an estimated 3.5 million potential class members).

### 3.     The Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Comcast*, 2019 WL 4645331, at *13 (*quoting NFL Concussion Litig.*, 821 F.3d 410, 438-39 (3rd Cir. 2016)(*quoting Warfarin,* 391 F. 3d at 537)).   Here, Class Counsel had vigorously prosecuted the case for over

---

[60] The deadline for objections, however, is not until January 15, 2020.  Should any objections be filed after the date of this brief they will be addressed in the briefing due February 14, 2020.

[61] *See* Miller Decl. at ¶¶ 7, 12, 13-16 and 22.

twelve years before securing the Settlements.[62]   During that time, Class Counsel conducted voluminous discovery, including reviewing approximately five million pages of documents produced by Defendants, taking over 180 depositions, defending the depositions of all five Plaintiffs, submitting highly qualified reports from eight separate experts and participating in extensive motion practice and lengthy court hearings concerning discovery, class and dispositive issues, and related ancillary proceedings.[63] The Settlements were reached only after summary judgment addressing developments in the law during the pendency of the action (including the *Actavis* ruling) had been briefed and resolved, the Court's ruling against Cephalon in the patent infringement case brought by Apotex, and class certification had been denied.[64]   Accordingly, the case was especially well-developed and Class Counsel had an ample appreciation of the merits at the time of the negotiations.   In such circumstances, this factor weighs in favor of approving the Settlements.

> **4.     The Risks of Establishing Liability and Damages and Risks of Maintaining Class Certification Through Trial**

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *NFL Concussion Litig.,* 821 F.3d at 438-39. (*quoting Prudential*, 148 F.3d at 319). The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial."  *Warfarin*, 391 F.3d at 537.  In this case, because the Court denied class certification, and therefore a class trial was foreclosed at the time the Settlements were reached, there is a necessary interplay between

---

[62] Meltzer Decl. at ¶¶ 10-27.

[63] *Id.*

[64] Two of the three settlements were reached after class certification had been denied, while the third was reached during the class certification hearing.

the fourth, fifth and sixth factors and they all unquestionably weigh in favor of settlement. Here when the likelihood of success in litigation is balanced against the benefits the Settlements deliver to the potential Class Members, the scales tip decidedly in favor of approving the Settlements.

The Settlements provide meaningful relief to the thousands of Class Members who had been denied the opportunity to prosecute their claims in litigation as part of a class, and who, therefore, faced the substantial likelihood that continued litigation would provide them with nothing. Trial would have been costly for the five individual End-Payor Plaintiffs and the outcome of any appeal over the denial of certification to the litigation class is uncertain and remote. In contrast, the Settlements provide the certainty of a total of $65,877,300 recovery to the Settlement Class now. In these circumstances, *Girsh* factors four, five and six weigh in favor of approving the Settlements.

### 5.    The Ability of Defendants to Withstand a Greater Judgment

This factor does not weigh either in favor or against approval of the Settlements here. For example, Cephalon,[65] which agreed to pay $48 million to settle this case, entered into a settlement with the Federal Trade Commission that created a $1.2 billion fund intended to cover claims arising out of the conduct at issue in this action.[66] As such, the ability of Cephalon, or indeed, the other Defendants was not a consideration that factored into the settlement negotiations.[67] In such circumstances, it has been held appropriate for a district court to conclude that this factor neither favors nor disfavors settlement. *See Warfarin*, 391 F.3d at 538. *See also*

---

[65] The amount of the Cephalon Settlement reflects Cephalon's greater culpability in Class Counsel's view. Unlike the other Defendants, Cephalon also faced *Walker Process* claims, and, following a bench trial, the Court had concluded that Cephalon obtained the patent at issue by fraud and made material misrepresentations to the PTO.

[66] Meltzer Decl. at ¶ 32.

[67] *Id.*

*In re Comcast*, 2019 WL 4645331, at *15 (even where a defendants' ability to withstand a greater judgment is conceded that fact does not undermine the reasonableness of a settlement where the defendant never professed an inability to pay during settlement negotiations).

> **6.    The Range of Reasonableness of the Settlement Fund In Light of the Best Possible Recovery and In Light of All the Attendant Risks of Litigation**

Quoting both *NFL Concussion Litig.*, 821 F.3d at 440, and *Warfarin*, 391 F. 3d at 538, the *In Re Comcast* court recently explained:

> In evaluating the eighth and ninth *Girsh* factors, we ask whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial.

2019 WL 4645331, at *15 (internal quotations and citations omitted). Here, Class Counsel achieved a value of $65,877,600 for Class Members. When considering whether this amount is reasonable, the Court should also take into account the $77 million obtained by the SHPs that settled with Cephalon separately from the Class. When so considered, the Settlements result in a recovery of $142,877,300 for those entities and consumers on whose behalf this lawsuit was instituted. This substantial settlement was achieved after class certification was denied, meaning that, absent this settlement, most Class Members would likely get no recovery at all. In light of the very real risks Plaintiffs would face if litigation continued, it is plain that the Settlements offers the best possible recovery.

Moreover, this amount is well within the range of other similar settlements.[68]  Notably, the $104.45 million settlement in *Lidoderm*, which is the largest Class Counsel is aware of, was

---

[68] *See* ECF No. 585, Appendix B (reflecting settlements in other generic suppression antitrust cases by certified classes of end-payors).

achieved after an end-payor litigation class had been certified.[69]  The $99 million settlement in *Tricor* was reached before class certification was resolved.

The range of reasonableness of the recovery provided by the Settlements is also apparent when considered as a percentage of the total overcharge damages of $1.244 billion calculated by Plaintiffs' expert Dr. Hartman.[70]  Specifically, $142,877,300 is approximately 11.5% of the total overcharge damages calculated by Dr. Hartman, an amount that certainly is justified in light of the benefit of the certainty of recovery it provides to Class Members.   As the Third Circuit recently observed, "[in] recognition that 'the outcome of litigation is always uncertain and inevitably time-consuming and expensive, courts have long held that a cash settlement providing only a fraction of the potential recovery does not render a settlement inadequate or unfair.'"  *In re N.J. Tax Sales Certificate Antitrust Litig.,* 750 F. Appx. 73, 82 (3d Cir. 2018) (rejecting arguments that the district court erred in finding a settlement amounting to 2.5% of the $400 million best possible recovery was in the range of reasonableness) (quoting *2 McLaughlin on Class Actions* § 6:16).  These two factors therefore weighs in favor of approval of the Settlements.

### C.     The Prudential and Direct Benefit Considerations Favor Approval

In addition to the *Girsh* factors, the Third Circuit framework for assessing the fairness, reasonableness and adequacy of a proposed settlement requires that a district court "apply[] the *Prudential* factors where applicable; and ...consider[] 'the degree of direct benefit provided to the class'...." *In Re Google*, 934 F. 3d at 329.   The *Prudential* factors, which are permissive and

---

[69] The order certifying both an indirect and direct purchaser classes was entered on February 21, 2017, in *In re Lidoderm Antitrust Litig.,* 14-md-02521, ECF No. 670 (N.D. Cal.).

[70] *See* Meltzer PA Decl., ECF No 586, Exhibit 18 ¶ 44.

non-exhaustive such that only those which are relevant to the litigation need be addressed,[71] often overlap with the *Girsh* factors, include:

> (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;
>
> (2) the existence and probable outcome of claims by other classes and subclasses;
>
> (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved or likely to be achieved for other claimants;
>
> (4) whether class or subclass members are accorded the right to opt-out of the settlement;
>
> (5) whether any provisions for attorneys' fees are reasonable; and
>
> (6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Cigna-American Specialty Health Admin. Fee Litig.*, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019) (citing *In re Pet Food Products Liability Litig.*, 629 F.3d 333, 350 (3d Cir. 2010)).   In considering the direct benefits provided to the class, the court may take into account "the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." *In Re Google,* 934 F. 3d at 329 (quoting *Baby Prods.*, 708 F.3d at 174).   As demonstrated below, these considerations also weigh in favor of approval of the Settlements.

### 1.    The maturity of the underlying substantive issues favors approval

As discussed above, prior to negotiating the Settlements Class Counsel had the benefit of extensive discovery on the merits which they had thoroughly analyzed allowing them to have an

---

[71] *Prudential,* 148 F.3d at 323-24; *see also Baby Prods.,* 708 F.3d at 174.

in depth understanding of the strengths and weaknesses of the merits of the case. The stage of the proceedings, including that class certification had been denied, also informed Class Counsel's view of the probable outcome at trial, and subsequent proceedings, at the time they negotiated the settlement. Relevant here too is the fact that the analysis and extensive negotiations that resulted in the Settlements were conducted at arm's length by advocates experienced in antitrust litigation and committed to the representation of the Class Members as demonstrated by their aggressive litigation of this case.[72]   Accordingly, the maturity of the underlying action favors approval of the Settlements.

**2.**     **The outcome of claims by other classes and subclasses, the results achieved or likely to be achieved for other claimants and the results achieved by the settlement for settlement class members favors approval**

The Settlements achieved here provide a direct recovery to the members a proposed class of end-payors who alleged that they suffered injury as a result of Defendants' anti-competitive conduct.  Other classes and claimants, including another generic manufacturer (Apotex), large pharmacy chains, the Federal Trade Commission, a Direct Purchaser class and certain state attorney-generals (those that were part of the AG Settlement), have previously reached settlements of their own claims based upon allegations of the same unlawful conduct.  Similarly, the State of California has achieved preliminary approval of the CAAG Settlement that this Court coordinated with these Settlements for purposes of notice and final approval.  Notably, consumers who are potential members of these Settlement Classes who recovered from the AG Settlement and/or who are entitled to recover for the CAAG Settlement, may also recover from the Settlements up to the amount of full reimbursement for their purchases of Provigil and/or modafinil.  Accordingly, these Settlements complement prior settlements and present the best

---

[72] *See* Meltzer Decl. at ¶¶ 10-39.

opportunity for potential Class Members to achieve full relief for the damages they alleged they suffered.  Additionally, as discussed herein, the Notice program was very robust and the claims process is not onerous, such that Class Members can readily realize the benefits of the Settlements. These factors, which also overlap with the claims processing and direct benefit considerations discussed below, accordingly weigh in favor of approval.

       **3.**      **Class Members have the right to opt-out of the Settlements**

This factor weighs in favor of the Settlement as Class Members who do not wish to be bound by the Settlement have the right to opt out.  Moreover, Class Members were made aware of such right through the Notice program, pursuant to which over 1.2 million direct Notices of the Settlements were mailed to consumer addresses and nearly 39,000 were sent to TPPs.   In addition, targeted publication and internet communications informed other potential class members of the proposed Settlements and their ability to opt-out if they so choose.  In response, as of this date, not more than ten Class Members have exercised that option. [73]

       **4.**      **Class members were fully advised of these Settlements' provision for attorneys' fees, which is subject to review and approval by the court for reasonableness, thus favoring approval**

Class Members were informed through the Notice program approved in the PAO that Class Counsel would seek an award of attorneys' fees of no more than one-third of the Settlement amount, which request would be subject to Court approval. The Notice also advised Class Members that in recognition of the contribution that Class Counsel made to the results achieved by the SHPs, Class Counsel has received a portion of the SHP's counsel's attorneys' fees and has agreed to pay a portion of any fee awarded as a result of these Settlements to SHP counsel.[74]  Simultaneously with this motion, Class Counsel have applied for attorneys' fees and

---

[73] See note 54, *supra.*

[74] Miller Decl., Exs. C and D, ¶ 20.

in support thereof have submitted a brief and declarations demonstrating that the fees sought are reasonable.  Accordingly, this factor weighs in favor of approval of the Settlements.

### 5.     The procedure for processing individual claims under the Settlements is fair and reasonable

As detailed in the Miller Affidavit submitted in support of Preliminary Approval,[75] the method proposed for processing class member claims is consistent with that successfully applied in similar cases by the proposed Settlement Administrator.  The information and documentation sought from Class Members is not onerous.  Moreover, as set forth in the Expert Reports of Glenn Melnick, Ph.D. and W. Paul DeBree, the information sought from the TPPs is regularly maintained by such entities.[76]  Consumer Class Members are asked only to provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019 along with one proof of purchase.[77]  The proof of purchase can take any number of forms, including, but not limited to: (1) pharmacy records showing what they paid for Provigil or modafinil; (2) an EOB (explanation of benefit) from the Class Member's insurer showing that they paid for Provigil or modafinil; or (3) a letter from the Class Member's doctor stating that the Class Member was prescribed Provigil or modafinil during the relevant time period.[78]  Further, potential Class Members were advised: "If you are having difficulty obtaining appropriate proof of payment, please contact the Settlement Administrator for assistance,"[79] and "[e]ven if you cannot locate proof of one purchase, you should still submit this Claim Form if you believe you are a Class Member because the Settlement Administrator may be able to help you find proof of

---

[75] The Miller Affidavit in Support of Preliminary Approval ("Miller PA Affidavit"), ECF No.586, Ex. 12 ¶ 28.

[76] ECF No. 586, Exs.10 and 11.

[77] *See* Miller Decl., Ex.C (Consumer Claim Form).

[78]  Id.

[79] As explained in the Expert Reports of Dr. Glenn Melnick and W. Paul Debree consumer prescription purchase history regularly maintained by large retail pharmacies and PBMs.  *See* Meltzer PA Decl. at Ex. 10 and Ex. 11.

payment."[80]   As such, the claims process is similar to others that courts have characterized as "not onerous" when granting final approval to a settlement. *See In re Comcast Corp.*, 2018 WL 4645331, at *16 (noting, in approving a settlement, that a claims process pursuant to which consumers had to submit a proof of payment in the form of a cancelled check, credit card or bank statement reflecting payment to Comcast during the Class Period or single invoice from Comcast reflecting a rental charge from Comcast during the Class Period was not onerous.).

The information provided by Class Members regarding their payments for Provigil or its generic equivalent in their claim forms will be reviewed by the Settlement Administrator, who is familiar with processing these types of claims and with the type of additional documentation that is available to support them and who will seek additional information as needed to verify and process the claims.[81]   Once the Settlement Administrator has received, reviewed and processed all of the timely claims, he will generate an approved claims list based upon that review, provide that list to Class Counsel and make distribution to Class Members with approved claims in accordance with the Plan of Allocation approved by the Court.[82]   As described more fully below, the Plan of Allocation allocates the net Class Settlement Fund in substantially the same manner as plans that have been approved and fairly and efficiently implemented in analogous cases.

### 6.      The Degree of Direct Benefit Provided to the Class

The final consideration in the Third Circuit's framework for addressing the fairness and reasonableness is the degree of direct benefit provided to the class. *In re Google,* 934 F. 3d at 329.   In making this additional inquiry "a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number

---

[80] *Id*.

[81] Miller PA Affidavit ¶¶ 8, 10, 11, 15-19, 24, 25-28.

[82] Miller PA Affidavit ¶¶ 19, 24.

of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards."  *Baby Prods.*, 708 F.3d at 174. This is a practical inquiry that focuses on what the settlement actually delivers to class members; whether claimants will be undercompensated as a result of the claims process used; and whether the claims process results in actual distribution of the settlement funds to class members. *See id.*; *See also In Re Comcast*, 2018 WL 4252463, at *16-17 (noting that despite robust efforts to notify class members of the settlement "only 20,262 individuals [out of an estimated 3.5 million class members] filed claims for a total of $211,255.00 in cash payments plus…$286,986.50 of in kind relief" from a common fund with a potential $15.5 million value, yet finding approval appropriate because the "*Girsh* factors and *Prudential* considerations overwhelming[ly] weigh in favor of approving the Settlement….").

Here the Settlement provisions and claims process ensure that all of the funds will be distributed to Class Members. Under the Plan of Allocation,[83] the settlement funds provided by each of the three Settlements (net of certain administrative costs related to each) will be combined into a single Class Settlement Fund to be used to pay Consumer and TPP claims that have been processed and authorized by the Settlement Administrator in accordance with the Plan of Allocation, after payment of administrative costs, any court-awarded attorneys' fees, any Class Representative Service Awards and costs of litigation.[84]

The net Class Settlement Fund will be allocated and disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net fund) and "Authorized TPP Claimants" (who will

---

[83] The Plan of Allocation allocates the net Class Settlement Fund in substantially the same manner as plans that have been approved by courts in analogous cases and implemented fairly and efficiently.  *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 264 (D.Del. 2002) *aff'd*, 391 F.3d 516 (3d Cir. 2004); *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 374 (D.D.C. 2002); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 357 (D.D.C. 2007).

[84] Meltzer PA Decl., Exhibit 9.

receive 86% of the net fund)[85] by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval.  The net Class Settlement Fund will be allocated *pro rata* based on each Class Member's unreimbursed payments for Provigil and modafinil during the class period.  Thus, all participating Class Members will receive a proportionate award based on the amounts they paid for Provigil and modafinil.[86]  If the claims of the "Authorized Consumer Claimants" do not fully exhaust the funds available to pay their claims, then the "spillover" amount will go to pay the claims of the Authorized TPP Claimants.[87]  This will ensure that all of the funds available for Class Member claims directly benefit and are actually disbursed to Class Members.

The experience of the Settlement Administrator in connection with similar notice programs, claims processes and plans of allocation confirms the direct benefit to the class that the Settlements will provide.[88]

*     *     *

In sum, all but one of the nine *Girsh* factors weigh in favor of approval (one factor is neutral) and all six of the *Prudential* considerations, as well as the Direct Benefit considerations, support approval of the Settlements.  Thus, upon application of the Third Circuit's framework for the assessment of the fairness, reasonableness and adequacy of class action settlements it is clear

---

[85] As defined in the Plan of Allocation, Authorized Consumer Claimants and Authorized TPP Claimants are Class Members who submit claims that are approved in whole or in part by the Claims [Settlement] Administrator.

[86] The Plan of Allocation also provides for adjustments to ensure that Class Members do not receive amounts in excess of the unreimbursed amounts that they paid for Provigil and modafinil. As such, it takes into account any amount that a Class Member received, if any, from the State Attorney General Settlement in calculating a Class Member's final recovery in this case. Class members are advised of this adjustment in the proposed Notice.

[87] See Meltzer Decl., Ex. 5 at 10-11.

[88] *See* Miller PA Affidavit at ¶¶ 2-11.

30

that the Settlements presented here fully meet requirements of Rule 23(e)(2) and so merit  final

approval.[89]

## V.    THE SETTLEMENT CLASSES PRELIMINARILY CERTIFIED BY THE COURT SHOULD BE GRANTED FINAL CERTIFICATION

"The ultimate decision to certify the class for purposes of settlement cannot be made until

the hearing on final approval of the proposed settlement," following notice to the class members.

*See* Advisory Committee Notes, 2018 Amendments to Fed. R. Civ. P. 23(e)(1).  *See also In re*

*Comcast Corp. Set-Top Cable TV Box Antitrust Litig.*, 2018 WL 4252463, at *7 (E.D. Pa. Sept.

5, 2018) (wherein court noted that it made a preliminary class determination upon preliminary

approval, "reserv[ing] the certification decision until after Notice of the proposed Settlement

Agreement has been sent to putative Class Members.").   Accordingly, on final approval, the

Court must revisit its prior determination in light of the response to the Notice and determine

whether the Settlement Classes satisfy the requirements for class certification.

### A.    The Standard Applicable to Certifying a Settlement Class

In making the decision to certify a class, whether for trial or for settlement, the Court

"must first find that the class satisfies all the requirements of Rule 23."  *In re Cmty. Bank of N.*

*Va.,* 418 F.3d 277, 300 (3d Cir. 2005).  Notably, however,

> [W]hile the structure of the analysis [is] the same, the questions of law and fact
> relevant to a settlement class differs somewhat from the questions relevant to a
> litigation class.  When ***'[c]onfronted with a request for settlement-only class
> certification, a district court need not inquire whether the case, if tried, would
> present intractable management problems, for the proposal is that there be no
> trial.'***  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citing FED.
> R. CIV. P. 23(b)(3)(D)); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir.
> 2005)).

---

[89] Indeed, federal courts regularly certify litigation and settlement classes asserting claims alleging delayed entry of generic prescription drugs like those asserted here.   *See* Appendix B to ECF No. 585-2, a chart titled "End Payor/Indirect Purchaser Classes Certified in Pharmaceutical Antitrust Litigation," listing and providing information on cases certifying end-payor classes.

*In re Processed Egg Prods. Antitrust Litig.,* 2016 WL 3584632, at *8 (E.D. Pa. June 30, 2016) (emphasis added).

When the Settlement Classes are analyzed again under the appropriate standards, and in light of the positive reaction of the potential Class Members to Notice of the Settlements, they continue to readily satisfy Rule 23. As set forth at length in the preliminary approval papers, and above, due to changes made to the definitions of the classes, the diminished predominance concerns presented by a settlement class, and a claims process that eliminates uninjured class members, the Settlement Classes are entirely appropriate for certification[90] notwithstanding the fact that the Court denied certification to a litigation class.[91]

### B.    The Requirements of Rule 23(a) are Satisfied

Certification is appropriate under Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a); *see also Amchem*, 521 U.S. at 613. As in many horizontal price-fixing lawsuits, these requirements are satisfied here. Indeed, this Court has already held that the

---

[90] On the record presented when Plaintiffs sought certification of a litigation class, the Court denied the certification motion, finding that Plaintiffs had not shown that they could objectively identify absent class members and remove uninjured persons on a classwide basis, thereby failing to satisfy Rule 23 with regard to ascertainability, predominance and superiority. *See Class Cert. Opinion*, obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing, at *1, 3, 13, 23, 32, 39-40. As set forth at length in the preliminary approval papers and exhibits thereto, ECF No. 585-1 at 12-14 changes in the class definitions, recent Third Circuit authority and an enhanced record including expert opinion addressing the ability to identify class members, compel a different conclusion with regard to certifying the Settlement Classes.

[91] Many courts have certified settlement classes after having previously declined to certify a litigation class, both in pay-for-delay antitrust cases, *see, e.g., Wellbutrin XL*, 282 F.R.D.at 145; *Skelaxin*, at ECF No. 950, and other areas of the law. *See, e.g., Carrera v. Bayer*, No. 2:08-cv-4716, ECF No. 145-1 ¶ 5 (D.N.J. Apr. 27, 2015) (certifying for settlement purposes the same class that the Third Circuit held was not shown to be sufficiently ascertainable to merit certification for litigation purposes in *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013)); *White v. Experian*, 2018 WL 1989514 (C.D. Cal. Apr. 6, 2018) (certifying a settlement class following a tentative ruling denying class certification of a litigation class on the grounds that the proposed class included individuals who did not suffer damages).

elements of numerosity, commonality, typicality and adequate representation are satisfied in this case. *See Class Cert. Opinion*, 2015 WL 3623005, at *13-16.

### 1. Numerosity is Satisfied

Numerosity is satisfied where the proposed class is so large that the traditional joinder of parties would be "unworkable." *In re Bulk (Extruded) Graphite Antitrust Litig.*, 2006 WL 891362, at *5 (D.N.J. Apr. 4, 2006). Generally, if the "potential number of plaintiffs exceeds 40, the [numerosity] prong of Rule 23(a) has been met." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 (3d Cir. 2016), *as amended* (Sept. 29, 2016).

The Settlement Classes include thousands of members who are geographically dispersed across 27 states. Over 1.2 million Notice packets have been mailed out to potential Class Members addresses. In these circumstances, the Court's prior determinations that numerosity has been satisfied remain correct.[92]

### 2. Commonality is Satisfied

Rule 23(a)(2) requires that there be "questions of law or fact common to the members of the class." As the Third Circuit has observed:

> A finding of commonality does not require that all class members share identical claims, and indeed factual differences among the claims of the putative class members do not defeat certification. The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.

*Prudential*, 148 F.3d at 310 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). The commonality requirement "is easily met because it may be fulfilled by a single common issue." *Linerboard*, 203 F.R.D. at 201.

---

[92] *See* PAO ¶ 4; *Class Cert. Opinion*, 2015 WL 3623005, at *13 (recognizing that "Dr. Hartman has identified in excess of five million total Provigil prescriptions filled in the relevant jurisdictions from 2006 through January 2011").

Even prior to so finding in its PAO,[93] this Court had found that common issues are present. *Class Cert. Opinion*, 2015 WL 3623005, at *14 (finding commonality satisfied here because establishing defendants' anticompetitive behavior "will require evidence common to the class"). In so concluding, this Court's analysis is in accord with the well-recognized proposition that "[c]ases involving 'the existence, scope, and efficacy of an alleged conspiracy' generally meet the commonality requirement because the allegations 'present questions adequately common to class members.'" *In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *5 (E.D. Pa. Jan. 24, 2014) (citation omitted).

As is typical in such cases, the issues here present a common thread, focusing on the central issue of the "existence of the alleged conspiracy and establishment of what the prices should have been" in a free and open market. *Phila. Elec. Co., et al. v. Anaconda Am. Brass Co.*, 43 F.R.D. 452, 458 (E.D. Pa. 1968). Accordingly, as the Court has previously found, commonality is satisfied.

### 3. Typicality is Satisfied

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." FED. R. CIV. P. 23(a)(3). The typicality factor examines "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc*., 457 F.3d 291, 295-96 (3d Cir. 2006). Typicality exists "[i]f the representative's claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories . . . regardless of factual differences underlying the individual claims." *Wellbutrin XL,*

---

[93] PAO ¶ 5.

282 F.R.D. at 138 (citing *Baby Neal*, 43 F.3d at 57-58); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 479 (W.D. Pa. 1999) (same).

In accord with decisions acknowledging that the typicality requirement is often satisfied in cases alleging horizontal price-fixing conspiracies,[94] this Court properly determined that the claims of the class representatives were typical of those of absent class members when it considered the proposed litigation class. *See Class Cert. Opinion*, 2015 WL 3623005, at *14.[95] Each Class Member's claim arises from the same alleged illegal practices and course of conduct that underlie the claims of the classes, namely, Defendants' conspiracy to fix, raise, maintain or stabilize Provigil prices. Each asserts the same legal theory that is asserted by the Settlement Classes as whole. Accordingly, typicality is satisfied.

### 4.        Adequacy is Satisfied

Rule 23(a)(4) requires that "[t]he representative parties will fairly and adequately protect the interests of the class." The Court must measure the adequacy of representation by two standards: (1) "ensure that the named plaintiff and its counsel have the ability and the incentive to represent the claims of the class vigorously," and (2) "that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 199 (E.D. Pa. 2017); *see also Fasteners*, 2014 WL 285076, at *6 (adequacy of representation requirement "has dual concerns: to ensure that class representatives do not have interests antagonistic to the class and that class counsel have the necessary skills and qualifications to adequately represent the class"); *Linerboard*, 203 F.R.D. at 207 (same).

---

[94] *See, e.g.*, *Linerboard,* 203 F.R.D. at 207 ("[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members.") (citation omitted).

[95] *See also* PAO ¶ 6(a).

In the PAO this Court found the five proposed class representatives to be adequate finding that the "Named Plaintiffs' interests do not conflict with the interests of absent members of the Settlement Classes."[96]   This assessment that adequacy is satisfied as to the named Plaintiffs remains valid.

With respect to counsel, the adequacy inquiry analyzes the capabilities and performance of Class Counsel under Rule 23(a)(4) based upon factors set forth in Rule 23(g).  *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010).  The qualifications and conduct of Class Counsel, already appointed by this Court as *interim* class counsel and preliminarily as Class Counsel by the PAO, demonstrate that they satisfy Rule 23(a)(4) as discussed and that should be appointed as Class Counsel under Rule 23(g) in the final approval order.

## C.       The Requirements Of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).[97]

### 1.       Common Legal And Factual Questions Predominate for the State Antitrust Claims

Rule 23(b)(3)'s requirement of predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 266 (quoting *Amchem*, 521 U.S. at 623-24). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried

---

[96] PAO ¶ 6(b). *See also Class Cert. Opinion*, 2015 WL 3623005, at *16 (observing there is no "evidence to establish a real probability of a conflict of interest among class members.").

[97] PAO ¶ 7.

separately, such as damages or some affirmative defenses peculiar to some individual members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations omitted).[98]

Notably, "for purposes of inquiring into the predominance of questions of law and fact relevant to a settlement class, manageability issues that are of obvious concern for anticipated litigation consideration are not similarly relevant." *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 3584632, at *8 (citing *Sullivan*).  As the Third Circuit has repeatedly explained, this is a "'key' distinction between certification of a litigation and settlement class." *Sullivan*, 667 F.3d at 306.  *See also Cmty. Bank*, 418 F.3d at 306 (the predominance test is more readily satisfied when considering a settlement-only class because "the court certifying the class need not examine issues of manageability.").  Accordingly, although both settlement and litigation classes must satisfy predominance, ***the Third Circuit has noted that "[w]e are nonetheless 'more inclined to find the predominance test met in the settlement context.'"***  *NFL Players Concussion Litig.*, 821 F.3d at 434 (quoting *Sullivan*, 667 F.3d at 304 n.29 (en banc)) (emphasis added).[99]

Horizontal price-fixing cases such as this have been recognized as particularly well-suited for class certification because proof of the conspiracy is a common, predominating question.  As the Third Circuit explained, antitrust cases "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual

---

[98] *See also Sullivan*, 667 F.3d at 301 ("We have never required the presentation of identical or uniform issues or claims as a prerequisite to certification of a class."); *Mercedes-Benz*, 213 F.R.D. at 186 ("mere existence of individual issues will not of itself defeat class certification"); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 269 (D.D.C. 2002) ("Rule 23(b)(3) requires that common issues predominate; it does not require that common issues be dispositive").

[99] *See also In re Am. Int'l Group Secs. Litig.*, 689 F.3d 229 (2nd Cir. 2012) (in reversing a district court's refusal to certify a settlement class, the Second Circuit explained that the predominance issues that led the Court to deny certification of the litigation class on manageability grounds do not preclude certification of a settlement class given that manageability concerns no longer apply).

class members." *Warfarin*, 391 F.3d at 528; *Sullivan*, 667 F.3d at 298 (same); *accord Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."). This case is no exception.

Indeed, at the class certification stage, Plaintiffs described the common evidence they would provide to establish their antitrust claims,[100] leading this Court to "agree with Plaintiffs that evidence of Defendants' alleged violations of the state antitrust laws would be common to the class." *Class Cert. Opinion*, 2015 WL 3623005, at *16, n.17; *see also Sullivan*, 667 F.3d at 300. As explained in *Wellbutrin XL*, in finding claims by indirect purchasers in a delayed generic entry case similarly satisfied the predominance requirement:

> Proof of antitrust violations and consumer protection laws in this case involve predominantly common issues. ***If each class member pursued its claims individually, the class member would have to prove the same antitrust and consumer protection violations using the same documents, witnesses, and other evidence.*** The issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members.

*Wellbutrin XL*, 282 F.R.D. at 140 (emphasis added).[101] This analysis and conclusion continues to apply and support the conclusion that Plaintiffs' claims of anti-competitive conduct involve predominating common issues.

a.      **Common Questions Also Predominate On The Antitrust Impact Element Of Plaintiffs' Claims**

In addition to proving the anti-competitive conduct, a plaintiff seeking to certify a class to pursue an antitrust claim must also establish "anti-trust impact," which is the fact of damage resulting from a violation of the antitrust laws, to prevail on an antitrust claim. *In re Modafinil Antitrust Litig.*, 837 F.3d at 262. In the litigation context, "the task for plaintiffs at class

---

[100] *See* ECF No. 585, at 43-62.

[101] *See also Flonase*, 284 F.R.D. at 219 ("The issue relevant to proving liability . . . can be proven through class-wide, common evidence because the issues focus on [Defendants'] conduct, not on the actions of the individual class members."

certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). This requires the Court asked to certify a litigation class to consider "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.*

In contrast, as discussed above, to certify a settlement class a plaintiff need not show that due to the availability of common evidence as to antitrust impact there are no "intractable management problems, for the proposal is that there be no trial." *See In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 3584632, at *8 (citing *AmChem* and *Sullivan*). As the Court's PAO reflects, because the Court now considers class certification in the settlement context based upon a record that addresses the Court's earlier concerns about impact issues, predominance is satisfied.

More specifically, and as discussed above, in connection with seeking certification of the Settlement Classes, Plaintiffs made changes to the class definitions, presented additional evidence in the form of expert reports and proposed a claims process that ensures that only those impacted by the challenged conduct qualify as members of the Settlement Classes. Accordingly, predominance remains satisfied as to antitrust impact.

### b. Common Issues Predominate With Regard to Damages

The same conclusion abides with regard to damages. "Calculations [of damages] need not be exact, but at the class certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation[.]'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (internal citations omitted). The Third Circuit has held that an antitrust plaintiff must prove "measurable damages," *Hydrogen Peroxide*, 552 F.3d at 325, but "the standard [of proof]

is somewhat relaxed." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 484 (3d Cir. 1998); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) (noting that a "relaxed measure of proof is afforded to the amount" of damages). Moreover, proof of aggregate damages is appropriate in class actions. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 198 (1st Cir. 2009) ("The use of aggregate damage calculations is well established in federal court and implied by the very existence of the class action mechanism itself.").

Here, Plaintiffs' economist Dr. Hartman presented a formulaic methodology by which damages can be calculated on a class-wide basis. In arriving at this conclusion, Dr. Hartman did not use any new or different methodology; rather, he implemented the same analysis that has been used many times and consistently accepted by courts in similar cases. The Court concluded that Plaintiffs demonstrated that "their damages were derived using a reliable method that took individual variations among class members into consideration" and that "Dr. Hartman's damages model comports with the remaining theories of liability." *Class Cert. Opinion*, 2015 WL 3623005, at *23, 25.[102] As such, the calculation of damages raises no obstacle to a finding of predominance, particularly since in the settlement context predominance concerns are diminished.

---

[102] *See also Flonase*, 284 F.R.D. 207 at 232 (granting class certification for indirect purchasers, noting "yardstick methodology has been accepted by courts as a means to measuring damages in both indirect and direct purchaser antitrust actions"); *Wellbutrin XL*, 282 F.R.D. at 144 (certifying class and concluding indirect purchasers presented a satisfactory methodology to estimate class-wide damages).

2.      **Common Questions Predominate For Unjust Enrichment And State Antitrust/Consumer Protection Claims**

As this Court has previously observed, concerns arising from variations in state law do not have the same significance when considering class certification in the settlement context that they have in the litigation context.  *See* Class Cert. Opinion, 2015 WL 3623005, at *33 (noting that certification of a multi-state class in *Sullivan* "involved a settlement class and [so] is of limited relevance to certification of a litigation class.").  In fact, the Third Circuit has stated that "in the settlement context, variations in state antitrust, consumer protection and unjust enrichment laws [do] not present the types of insuperable obstacles that could render class litigation unmanageable," *Sullivan*, 667 F.3d at 303 (internal quotations omitted), as the settlement eliminates the need for a trial.  *See also Amchem,* 521 U.S. at 620 (in a settlement-only class certification, "a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial").  Because of this, "variations [in state laws] are irrelevant to certification of a settlement class since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws."  *Id.* (internal quotations omitted).  Thus, any variations among the laws of the 27 states encompassed by the Settlement Agreements are simply not relevant and do not defeat predominance at this juncture.

D.      **Rule 23(b)(3) Class Is Superior To Other Methods Of Adjudication**

Finally, FED. R. CIV. P. 23(b)(3) requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy."[103]      Factors

---

[103] To determine superiority, a court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."  *Flonase*, 284 F.R.D. at 234 (quoting *Georgine v. Amchem Prods.,* 83 F.3d 610, 632 (3d Cir. 1996)).  There are four factors to be considered:  "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  *Class Cert. Opinion,* 2015 WL 3623005, at *35.

considered with regard to superiority include "the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action.  FED. R. CIV. P. 23(b)(3)(A)-(D)."   *NFL Concussion Litig.*, 821 F.3d at 434-35. "The superiority inquiry is simplified in the settlement context, because when certifying a settlement only class, the Court need not inquire whether the case, if tried, would pose intractable management problems, for the purpose of the settlement is not to have a trial."   *In re Cigna-American Specialty Health Admin. Fee Litig.*, 2019 WL 4082946, at *10 (citing *Amchem*, 521 U.S. at 620).  Thus, in conducting the superiority analysis, "the district court may take the proposed settlement into consideration."   *Id.* (citing *Prudential II*, 148 F. 3d at 308 and *Warfarin Sodium II*, 391 F. 3d at 529).

Accordingly, it is relevant to the current superiority inquiry that because of the Settlements there are no individualized issues related to proving anti-trust impact at trial nor are there predominance issues related to variations in state law.  *See Class Cert. Opinion,* 2015 WL 3623005, at *32, (citing *Sullivan,* 667 F.3d at 303-304) (a settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and 'the difference is key.'").  Correspondingly, as "in light of the Settlements preliminarily approved therein," "there are few manageability problems presented by a case such as this," superiority is easily satisfied.[104]

Moreover, many of the individual class members, consumers and smaller health plans, have relatively small damages,[105] meaning they could not practicably pursue complex antitrust litigation against Cephalon and the Generic Defendants, five large pharmaceutical companies

---

[104] PAO ¶ 8.

[105] Plaintiffs' economist Dr. Hartman calculated individual damages for each of the fund plaintiffs and determined that two of the Plaintiff funds have total damages of under $100,000, a figure that would make them very unlikely to undertake this costly antitrust litigation on their own.  *See* Hartman Report on Calculation of Classwide Damages, Meltzer PA Decl., Exhibit 18 at 23.  Consumer plaintiff Shirley Panebianco's total Provigil purchases (not even damages) are approximately $1600.  *See* Panebianco's Bridge Pharmacy records, Meltzer PA Decl. Exhibit 17.

with almost limitless resources represented by some of the best law firms in the country.  *See McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 478-79 (E.D. Pa. 2009) ("In this case, a class action would be more fair and efficient than alternative methods of adjudication . . . Subclass members would have little economic incentive to litigate their claims individually—thus barring recovery for most absent a class action . . . .").  Without the Class Settlements these consumers and small plans will very likely get nothing.  *See Amchem*, 521 U.S. at 617 (noting Rule 23 was contemplated for the "rights of groups of people who individually would be without effective strength to bring their opponents into court at all.") (citation omitted).

All of the foregoing confirms that superiority is satisfied. Indeed, courts within this circuit readily recognize the superiority of class treatment in similar cases.[106]

### E. This Court Should Appoint Interim Class Counsel as Class Counsel

This Court has twice determined, pursuant to Rule 23(g), that the firms Spector Roseman & Kodroff, Kessler Topaz Meltzer & Check, and Criden & Love merit appointment as class counsel under Rule 23(g)—when it appointed those firms as interim Class Counsel[107] and when it appointed those same firms as Co-Lead Counsel for the Settlement Classes in the PAO.[108] That appointment merits confirmation in an order providing for final certification of the Settlement Classes.

As the Court previously determined, each of Rule 23(g)(1)(A)'s considerations weighs strongly in favor of finding Interim Class Counsel adequate.  Interim Class Counsel did extensive work identifying and investigating the claims and committed substantial resources to

---

[106] For example, in *Wellbutrin XL*, the court granted certification of indirect purchaser plaintiffs' claims that defendant unlawfully excluded generic versions of Wellbutrin XL through sham litigation.  In doing so, the Court noted that: "Individual treatment of each class members' claims would require duplicative, expensive litigation, which would come at enormous expense to the parties and judicial economy.  Class resolution would also avoid problems of inconsistent resolution."  *Wellbutrin XL*, 282 F.R.D. at 145 (quoting *Warfarin*, 391 F.3d at 529).  See also *In re Remeron End-Payor Anti-Trust Litig.*, 2005 U.S. Dist. LEXIS 27011 at *34-35 (D.N.J. Sept. 13, 2005).

[107] ECF No. 21.

[108] PAO, ¶ 9.

pursuing a favorable outcome for the Settlement Classes.  *See Class Cert. Opinion*, 2015 WL 3623005, at *15.  The firms of Spector Roseman & Kodroff, Kessler Topaz Meltzer & Check, and Criden & Love have decades of collective experience and proven track records of success in highly complex antitrust class actions, such as this one.[109]  They have and will continue to work on behalf of the proposed Settlement Classes in seeking approval of and implementing the Settlements.  Accordingly, their appointment as Co-Lead Counsel should be affirmed a final order certifying the Settlement Classes and approving the Settlements.

## VI.     THE PLAN OF ALLOCATION SHOULD BE GRANTED FINAL APPROVAL

This Court should also approve the Plan of Allocation, which sets forth how claims will be reviewed and processed, and how Settlement Funds will be allocated and disbursed.[110] "Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to the approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate."  *Melhing v. N.Y. Life Ins. Co*., 248 F.R.D. 455, 463 (E.D. Pa. 2008).  "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  *In re Flonase Antitrust Litig*., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)).  "In determining whether a Plan of Allocation is fair, reasonable, and adequate, courts give great weight to the opinion of qualified counsel."  *In re Schering-Plough Corp*., 2012 WL 1964451, at *6 (D.N.J. May 31, 2012).

Here, the separate settlement funds provided by each of the three Settlements (net of certain administrative costs related to each) will be combined into a single Class Settlement Fund

---

[109] The resumes of the three firms are attached as Exhibits 20-22 to the Meltzer PA Decl.

[110] Meltzer Decl., Ex. 5.  The Plan of Allocation was described in general terms in the Long Form Notice and with specificity in the preliminary approval papers, including the Plan of Allocation itself that are posted on the Settlements website.  To date, there have been no objections to any aspect of the Settlements, including the Plan of Allocation.

to be used to pay Consumer and TPP claims that have been processed and authorized by the Settlement Administrator in accordance with the Plan of Allocation, after payment of administrative costs, any court-awarded attorneys' fees, any Named Plaintiffs' Case Contribution Awards and costs of litigation.[111]   The net Class Settlement Fund remaining after the approved deductions, will be allocated *pro rata* based on each Class Member's unreimbursed payments for Provigil and modafinil during the class period.   The net Class Settlement Fund will be so allocated and disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net fund) and "Authorized TPP Claimants" (who will receive 86% of the net fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval.   Thus, all participating Class Members will receive a proportionate award based on the amounts they paid for Provigil and modafinil.   Such method of allocation is inherently reasonable as it bases Class Members' reimbursements on the type and extent of their injuries and is similar to that approved and employed successfully in multiple previous Hatch-Waxman purchaser class cases.[112]

---

[111] *Id*. at Sections I(k) and III.B.

[112] *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d at 752 (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. at 184); *In re Corel Corp. Inc. Securities Litig.*, 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003) (courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable").   Courts have approved similar plans of allocation in analogous cases involving the suppression of generic competition, (*see, e.g.*, *In re Doryx Antitrust Litig.* (*Mylan Pharms., Inc., v. Warner Chilcott Public Ltd.*), No. 12-cv-3824 (E.D. Pa.), Dkt No. 452-3, at 2 (*pro rata* shares of settlement fund computed on basis of class members' purchases of brand); *In re Skelaxin Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn.), Dkt No. 788 at 6 (same); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-2237 (S.D.N.Y.), Dkt No. 101 at 19-20 (S.D.N.Y.) (same); *In re Miralax Antitrust Litig.*, No. 07-cv-142 (D. Del.), Dkt No. 240, at 18 (same); *In re Prograf Antitrust Litig.*, No.11-md-2242 (D. Mass.), Dkt No. 667-2, at 2 (same); *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, No.06-cv-52 (D. Del.), Dkt No. 192 at 18 (same); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340 (D. Del.), Dkt No. 536-1 at 19 (same); *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa.), Dkt No. 481-1 at 16 (same)).   *See also* Miller PA Affidavit ¶ 28.

## VII.   CONCLUSION

For all of the foregoing reasons, Plaintiffs *respectfully* request that the Court grant Final Approval to the Settlements preliminarily approved in the August 8, 2019 PAO, certify the Settlement Classes, approve the Plan of Allocation, and enter the proposed Order Granting End-Payor Plaintiffs' Motion for Final Approval of Class Action Settlements submitted herewith.


Dated:  December 16, 2019

By: *s/ Joseph H. Meltzer*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706

**SPECTOR ROSEMAN**
**& KODROFF, P.C.**
Jeffrey L. Kodroff
John A. Macoretta
2001 Market Street – Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300

**CRIDEN & LOVE, P.A.**
Kevin B. Love
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Tel: (305) 357-9000


***Co-Lead Counsel for***
***End-Payor Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2019, a true and correct copy of the foregoing document was electronically filed, will be available for viewing and downloading from the Court's ECF system and will be served by CM/ECF upon all counsel of record.


*s/ Joseph H. Meltzer*
Joseph H. Meltzer