**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
|                                        :
**VISTA HEALTHPLAN, INC., et al.,**      :     **CIVIL ACTION**
|                                        :
**Plaintiffs,**                          :
|                                        :
**v.**                                   :     **No. 2:06-cv-1833**
|                                        :
**CEPHALON, INC., et al.,**              :
|                                        :
**Defendants.**                          :
_____:

**Goldberg, J.**                                              **April 20, 2020**

<u>**MEMORANDUM**</u>

This case arises out of a set of antitrust actions which involve reverse settlement payments involving the drug Provigil®. The parties included a brand-name drug manufacturer, numerous generic drug companies, retail drug distributors, the Federal Trade Commission, States Attorneys General, direct purchasers, and end-payors. The End-Payor Plaintiff ("EPP") action, captioned under <u>Vista Healthplan et al. v. Cephalon, et. al.</u>, Civ. A. No. 06-1833, culminated in a settlement for which the EPPs now seek approval. On August 8, 2019, I granted preliminary approval of the settlement and preliminarily certified two classes for settlement purposes.

The EPPs now move for final approval of the settlement. Upon review of the parties' briefing and considering the arguments at the final fairness hearing on February 26, 2020, I will certify a settlement class, grant final approval of the class action settlement, and award attorneys' fees, costs, and incentive payments as requested.

I.      **FACTUAL HISTORY**

A.      <u>**Background of the EPPs' Claims**</u>

In May and June 2006, several now-consolidated cases were filed on behalf all persons who paid for Provigil and/or generic modafinil in twenty-seven states and the District of Columbia, against Defendants Cephalon, Inc., Barr Laboratories, Inc., Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc. (collectively, "the Cephalon Parties"),[1] Mylan Inc., Mylan Pharmaceuticals Inc. (collectively "Mylan"), and Sun Pharmaceutical Industries, Ltd. as successor-in-interest to Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy") (all of the foregoing collectively referenced as "Defendants").

The lawsuit alleged that, in April 1997, the Patent and Trademark Office issued U.S. Patent No. 5,618,845 ("the '845 patent") to Cephalon, Inc., which patented a specific formulation of modafinil known as Provigil, a wakefulness-promoting drug.  In 2002, Cephalon, Inc. was granted a reissue patent on Provigil, U.S. Patent No. RE 37,516 ("the RE '516 patent"), which was scheduled to expire October 6, 2014.  As a result of studying the drug's effects on children, Cephalon, Inc. received an additional six months of pediatric exclusivity on Provigil, extending Cephalon, Inc.'s exclusivity period through April 6, 2015.

On December 24, 2002, four generic drug manufacturers—Barr Laboratories, Inc., Teva Pharmaceutical Industries Ltd./Teva Pharmaceuticals USA, Inc., Mylan Inc./Mylan Pharmaceuticals Inc., and Ranbaxy Pharmaceuticals, Inc. (collectively, the "Generics")— filed Abbreviated New Drug Applications ("ANDAs") for generic Provigil, each certifying that Cephalon Inc.'s patent was either invalid or would not be infringed by their generic modafinil

---

[1]    During the pendency of this litigation, Barr Laboratories, Inc. Teva Pharmaceutical Industries Ltd., and Teva Pharmaceuticals USA, Inc. merged with Cephalon, Inc. making them all one entity, which, for purposes of this Opinion, I collectively refer to as "the Cephalon Parties."

product.  As first-filers, all of the Generics, upon FDA approval, were entitled to share in 180 days of exclusive marketing, a characteristic of the Hatch-Waxman Act, Pub. L. No. 98-417.  On March 28, 2003, following the Generics' ANDA filings, Cephalon, Inc. sued the Generics for patent infringement.

All of the litigation between Cephalon, Inc. and the Generics was settled between December 2005 and February 2006, while motions for summary judgment were pending.  The settlements each permitted the Generics to launch their generic Provigil product on April 6, 2012, prior to the expiration of the RE '516 patent.  The agreements further contained "contingent-launch provisions," which permitted each Generic to market generic Provigil prior to that date if any other company marketed generic Provigil, whether through a license or at-risk, or if the RE '516 patent was declared invalid, unenforceable, or not infringed by generic Provigil.  Each of these settlement agreements contained provisions for and/or were signed alongside licenses for intellectual property, active pharmaceutical ingredient supply agreements, and pharmaceutical development agreements.  Cephalon, Inc. agreed to pay a total of approximately $300 million to the Generics as a result of these agreements.

In subsequently-filed litigation, various groups—including direct purchasers, end-payors, a generic drug companies, retail drug distributors, the Federal Trade Commission, and States Attorneys General—alleged that these settlement transactions between Cephalon, Inc. and the Generics were anticompetitive "reverse-settlement" payments that violated antitrust laws. Specifically, they contended that but for these payments, the Generics would have launched generic Provigil at risk, and thus lower-cost generic competition would have been brought to the relevant market by June 2006.

### B.   <u>Brief Procedural History of the Litigation</u>

Multiple end-payor plaintiffs, or EPPs—including both consumers and large Third-Party payors ("TPPs") who paid for Provigil and/or modafinil in twenty-seven states and the District of Columbia—filed antitrust complaints against Defendants.  By way of an August 8, 2006 Court Order, all actions that had been filed alleging claims against Defendants and seeking damages and other relief for injuries allegedly sustained as a result of Defendants' anti-competitive conduct were consolidated for pre-trial purposes.

On April 6, 2009, the consolidated cases were transferred from the Honorable R. Barclay Surrick to my docket for all further proceedings.  The same day I entered an order vacating the previous case management orders, and consolidating all EPP actions for all purposes under the caption of <u>Vista Healthplan Inc. v. Cephalon, Inc. et al.</u>, Civ. A. No. 06-1833.

An Amended Consolidated Class Action Complaint was filed in August 2009 on behalf of all of the EPPs.  On August 18, 2009, I entered an order formally appointing Kessler Topaz Meltzer & Check, LLP, Spector Roseman & Kodroff, P.C. and Criden & Love, P.A. as Interim Co-Lead Class Counsel to act on behalf of all plaintiffs in the EPP putative class action.

At the end of August 2009, Defendants filed renewed motions to dismiss.  Following oral argument, I substantially denied the motions to dismiss.  Thereafter, over the next several years, the parties engaged in extensive discovery involving written discovery, more than 180 depositions, significant expert discovery, and extensive motion practice.

In 2013, the parties filed summary judgment motions.  In March and June 2014, I granted in part and denied in part the EPPs' motion, and granted Defendants' motions on the EPPs' allegations of an overall conspiracy.

In the interim, the United States Supreme Court issued a decision in <u>F.T.C. v. Actavis, Inc.</u>, 570 U.S. 136 (2013), which recognized that settlements in which a holder of a pharmaceutical patent makes a payment to an alleged patent infringer to resolve a challenge to the patent—*i.e.*, a reverse payment settlement—"can sometimes violate the antitrust laws."  <u>Id.</u> at 141.  In light of the guidance provided by <u>Actavis</u>, Defendants filed motions for summary judgment on the EPPs' claims, which I denied.

The EPPs moved for class certification on May 12, 2014.  Following extensive briefing and a certification hearing, I denied class certification on June 10, 2015.  <u>Vista Healthplan, Inc. v. Cephalon, Inc.</u>, No. 06-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015).  Specifically, I found that the EPPs had not met their burden of proving ascertainability for any class, predominance as to antitrust impact for the proposed antitrust class, or predominance and superiority as to the proposed unjust enrichment/consumer protection class.  <u>Id.</u>  Class Counsel sought immediate review of this decision under Federal Rule of Civil Procedure 23(f), but the United States Court of Appeals for the Third Circuit denied the petition.

### C.     <u>Preliminary Negotiations and Settlement</u>

In January 2014, settlement discussions among the EPPs and Defendants began before United States Magistrate Judge David R. Strawbridge and two Special Masters, Robert Heim and Constantine Canon.  Following two full days of mediation, Class Counsel continued to engage in settlement negotiations with Defendants.

The EPPs first reached a settlement with Mylan, which was announced at the class certification hearing on March 24, 2015.  Mylan agreed to pay the EPPs a total of $14,377,600 to fully resolve all claims against it ("Mylan Settlement Agreement").

In October 2015, following the Cephalon Defendants' $1.2 billion settlement with the Federal Trade Commission ("FTC"), the Cephalon Defendants orally agreed to a settlement with the EPPS and a separate group of over forty health plans (the "Settling Health Plans" or "SHPs"), who opted to proceed separately from the class proceedings following the denial of class certification.   The EPPs, SHPs, and the Cephalon Defendants entered a Memorandum of Understanding ("MOU") in December 2015, providing for Cephalon to pay $125 million—$48 million to the EPPs and $77 million to the SHPs—in exchange for releases ("Cephalon Settlement Agreement").

The Cephalon Settlement Agreement was delayed when United Health Care ("United"), one of the SHPs that signed the MOU, renounced its agreement to settle and initiated its own litigation against the Cephalon Defendants, Ranbaxy, and Mylan under Civil Action No. 17-555. The Cephalon Defendants then sued United, under Civil Action No. 16-4870, to enforce the MOU. Following summary judgment briefing and a non-jury trial, I determined, on September 19, 2018, that United was bound by the terms of the MOU.  While that litigation was pending, however, the EPPs, SHPs, and the Cephalon Defendants executed a May 2018 settlement agreement, which created a carve-out for United, while acknowledging the existence and lack of impact of the MOU litigation.

The EPPs and Ranbaxy reached a settlement on the eve of trial in September 2018.  The settlement with Ranbaxy is for $3.5 million ("Ranbaxy Settlement Agreement").

### D.    Preliminary Approval of the Settlement and Notice

On August 8, 2019, I entered an order for preliminary approval of the proposed settlements (collectively, the "Settlement"), for preliminary certification of the Settlement Classes, and for

permission to disseminate notice of the proposed Settlement to members of the Settlement Classes

("Preliminary Approval Order").  The Preliminary Approval Order certified the following classes:

### State Antitrust/Consumer Protection Class

All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent intended for consumption by themselves, their families or their members, employees, plan participants beneficiaries or insureds between June 24, 2006 and August 8, 2019.

### State Unjust Enrichment Class

All persons or entities in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds between June 24, 2006 and August 8, 2019.

(ECF No. 592.)

The following persons or entities were excluded from the proposed Settlement Classes:

(i) the Defendants and their respective subsidiaries, affiliates and employees; (ii) all governmental

entities (except for government funded employee benefit plans); (iii) insured individuals covered

by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand

generic purchases; (iv) insured individuals who purchased only generic modafinil (not branded

Provigil) pursuant to a fixed co-pay applicable to generic drugs; (v) United Healthcare Services,

Inc. ("United Healthcare"), including its subsidiaries; and (v) fully-insured health plans, *i.e.* plans

that purchased insurance from another third-party payor covering 100% of the plan's

reimbursement obligations to its members.   In addition, the Settling Health Plans ("SHPs"), identified in Schedule A to the Cephalon Settlement, are excluded from the Cephalon Settlement.

Following entry of the Preliminary Approval Order, Class Counsel worked with Settlement Administrator A.B. Data, Ltd. ("A.B. Data") to implement the approved notice program ("Notice Program").  The EPPs coordinated notice with the California State Attorney General, who filed a separate action in this Court for approval of its own settlement with Cephalon under Civil Action No. 19-3281 (the "California Settlement").   As described by the EPPs, the Notice Program consisted of:

- Direct notice to potential Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies;

- Direct notice to potential members of the Settlement Class identified through the States' Attorneys General Provigil Settlement;

- Publication notice in national consumer magazines;

- Internet banner and newsfeed ads on multiple networks, including social media and targeted websites;

- Distributing notice via PR Newswire's US1 Newsline;

- Developing and launching a dedicated information website for the Settlement at ProvigilSettlement.com; and

- Establishing a dedicated toll-free telephone number with an interactive voice response system and live operators.

(Decl. of Joseph Meltzer ("Meltzer Decl."), Ex. 4, ¶¶ 3, 6–19.)

As described in the Notice, in order to submit claims, Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms including pharmacy records, an insurance EOB (explanation of benefits) form, or letter from the claimant's doctor.  (Decl. of Eric Miller ("Miller Decl."), Ex. C.)  Absent a proof of purchase, a Class Member can seek help from the Settlement Administrator to file a valid claim.  (Id.)  As then explained in the End-Payors' Plan of Allocation, the Settlement Administrator will review and process all submitted claims to determine whether there are any deficiencies and, if so, to notify the Claimant how to cure the deficiency.  (Meltzer Decl., Ex. 5.)  Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which claims are authorized for approval or are ineligible.  (Id.)

The proposed Plan of Allocation then calls for payment of any approved attorneys' fees, litigation costs, settlement administration costs, escrow administration costs, and incentive payments from the settlement funds received from each of the three Defendants.  Following those disbursements, the net settlement funds ("Net Class Settlement Fund") will be used to pay class claims that have been approved and authorized.  The Net Class Settlement Fund will be disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net Class Settlement Fund) and "Authorized Third Party Payor (TPP) Claimants" (who will receive 86% of the Net Class Settlement Fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval.  If there are sufficient funds, each Authorized Consumer Claimant shall receive 100% of their Authorized Consumer Claim (reduced by money that the Authorized Consumer Claimant has received in any other modafinil settlement).  If there are insufficient funds to pay each Authorized Consumer Claimant 100% of their Authorized Consumer Claim, then each

Authorized Consumer Claimant shall receive a *pro rata* share of the fund.  If, after all Authorized Consumer Claimants are paid 100% of their claims, funds remain in the Consumer Distribution Fund, those remaining funds shall be added to the TPP Settlement Fund and paid out to Authorized TPP Claimants.

As of February 2020, there were a total of eighteen potential Class Members who sought exclusion from the Class.  (Supp. Decl. of Eric Miller (Supp. Miller Decl.) ¶¶ 5–6.)  Nearly 40,000 Settlement Class Members had responded by filing claims to participate in the Settlement.  (Id. ¶ 7.)  Finally, there were objections from three potential Class Members—Barry Balach, Carlton Davis, and Daniel Dunham—each of whom submitted a one to two page letter.

### E.   Motion for Final Approval

In December 2019, Class Counsel filed the present Motion for Approval of Proposed Settlements with All Defendants, for Certification of Settlement Classes, and for Final Approval of the Plan of Allocation.  Class Counsel also filed a Motion for an Award of Attorneys' Fees, for Reimbursement of Litigation Expenses, and for Incentive Awards for the Class Representatives.

I held a final fairness hearing on February 26, 2020 on both this $65,877,600 Settlement and the $25.25 million California Settlement.

## II.   LEGAL STANDARDS

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995).  This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims."  In

re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805).  A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate."  In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e)(2)).  The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished."  In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001).  "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate."  G.M. Trucks, 55 F.3d at 785 (quotations omitted).  While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806).  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court."  Id. at 299 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

Where, as here, the court has not already certified the class prior to evaluating the settlement, the court must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b), and then separately determine whether the settlement is fair to

the class under Rule 23(e).  In re NFL, 775 F.3d at 581; In re Pet Food Prods. Liab. Litig., 629

F.3d 333, 341 (3d Cir. 2010).

Under Rule 23(h), at the conclusion of a successful class action, class counsel may apply

to a court for an award of attorney's fees.  The amount of an attorney's fee award "is within the

district court's discretion so long as it employs correct standards and procedures and makes finding

of fact not clearly erroneous[.]"  Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en

banc) (internal quotation marks omitted).

## III.    CERTIFICATION OF A SETTLEMENT CLASS

Prior to inquiring into the fairness of the Settlement, I must first ensure that the certification

requirements set forth in Federal Rule of Civil Procedure 23(a) and (b) have been satisfied.

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997); In re NFL, 775 F.3d at 581.  The

Supreme Court has made clear that "[s]ettlement is relevant to a class certification."  Amchem

Prods., 521 U.S. at 619.  Consequently, a district court "may take the proposed settlement into

consideration when examining the question of certification."  In re Prudential Ins. Co., 148 F.3d

at 308.  Specifically, the Supreme Court has explained:

> Confronted with a request for settlement-only class certification, a
> district court need not inquire whether the case, if tried, would
> present intractable management problems, for the proposal is that
> there be no trial. But other specifications of [Rule 23]—those
> designed to protect absentees by blocking unwarranted or
> overbroad class definitions—demand undiluted, even heightened,
> attention in the settlement context. Such attention is of vital
> importance, for a court asked to certify a settlement class will lack
> the opportunity, present when a case is litigated, to adjust the class,
> informed by the proceedings as they unfold.

Amchem, 521 U.S. at 620 (citations omitted).  The court should put particular emphasis on the

Rule 23(a)(4) requirement that the representative will fairly and adequately protect the interests of

the class.  In re Pet Food Prods., 629 F.3d at 341–42.

To obtain certification, a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), which sets forth four prerequisites to class certification:

> (1) the class is so numerous that joinder is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Following consideration of these four prerequisites—often referred to as numerosity, commonality, typicality, and adequacy of representation—the court must examine whether the class falls within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). In re Cmty. Bank of N. Va., 418 F.3d 277, 302 (3d Cir. 2005). The EPPs move for class certification under Rule 23(b)(3), which provides for certification when:

> [T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy  already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).   Stated differently, to satisfy Rule 23(b)(3), the court must find "predominance" and "superiority."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004).

Finally, the Third Circuit has recognized that Rule 23(b)(3) carries with it an "ascertainability" requirement.  Byrd v. Aaron's Inc., 784 F.3d 154, 161–62 (3d Cir. 2015).  "The ascertainability requirement as to a Rule 23(b)(3) class is consistent with the general understanding that the class-action deviates from the normal course of litigation in large part to achieve judicial economy."  Id.  at 162.  It "ensures that a proposed class will actually function as a class."  Id.  The Third Circuit has explained that "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that:  (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  Id. at 163 (internal quotation marks omitted).

Ultimately, a court's class certification analysis must be "rigorous."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011).  "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met," and that "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."  Hydrogen Peroxide, 552 F.3d at 307.  Thus, "to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."  Id. at 320.

## A.    Rule 23(a) Requirements

### 1.    Numerosity

A plaintiff seeking certification must first demonstrate that the class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  "In recent years, the numerosity

requirement has been given 'real teeth.'" Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 484 (3d Cir. 2018). Third Circuit precedent demands that a court "make a factual determination, based on the preponderance of the evidence, that Rule 23's requirements have been met." Id. (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 596 (3d Cir. 2012)).

The first part of the numerosity inquiry is the size of the class. "No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members." Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989); see also Chakejian v. Equifax Info. Servs., LLC, 256 F.R.D. 492, 497 (E.D. Pa. 2009). As a general rule, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). On the other hand, a class of fifteen to twenty is likely too small to meet the numerosity requirement. In re Modafinil Antitrust Litig., 837 F.3d 238, 250 (3d Cir. 2016). Classes with between twenty-one and forty members are given varying treatment, depending on the circumstances of each case. Id.

The second half of the numerosity inquiry looks at the impracticability of joinder. Whether joinder of all of the class members would be impracticable depends on the circumstances surrounding the case and not merely on the number of class members. In re Modafinil, 837 F.3d at 249. The Third Circuit has enumerated a non-exhaustive list of factors to consider, including: judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages. Id. at 253. Of those factors, both judicial economy and the ability to litigate as joined parties are of primary importance. Id.

Where, as here, plaintiffs seek a to certify a class of thousands of Consumer Class Members and TPP Class Members, numerosity is easily satisfied.  See In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 137 (E.D. Pa. 2011) (finding numerosity met where plaintiff class involved hundreds of thousands of consumer class members and thousands of TPP class members).  In my prior Opinion denying certification of a litigation class, I noted that the EPPs' expert had identified in excess of five million total Provigil prescriptions filled in the relevant jurisdictions from 2006 through January 2011.  Vista Healthplan, Inc. v. Cephalon, Inc., 06-1833, 2015 WL 3623005, at *13 (E.D. Pa. June 10, 2015) ("Prior Certification Opinion").  Consistent with that prior decision, I again find numerosity satisfied.

2.   Commonality

Rule 23(a)(2) next requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "[C]ommonality does not require perfect identity of questions of law or fact among all class members.  Rather, 'even a single common question will do.'" Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (quoting Dukes, 564 U.S. at 359).  "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant[s'] conduct was common as to all of the class members." Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation and citations omitted).  All plaintiffs need not suffer the same injury.  The fact that the plaintiffs were subjected to the injury or faced the immediate threat of these injuries suffices for Rule 23.  Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); see also Rodriguez, 726 F.3d at 383 ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant.").  "Even where individual facts

and circumstances do become important to the resolution, class treatment is not precluded." Baby Neal, 43 F.3d at 57.

Ultimately, the commonality bar is not a high one. Rodriguez, 726 F.3d at 382. To satisfy Rule 23(a)(2), the resolution of the common question of law or fact must "resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350. Commonality exists in cases where "[e]ach putative class member alleges that Defendants caused overcharges by engaging in an anticompetitive scheme to delay and suppress generic competition." In re Loestrin 24 Fe Antitrust Litig., No. 13-2472, 2019 WL 3214257, at *11 (D.R.I. July 2, 2019); see also In re Flonase Antitrust Litig., 284 F.R.D. 207, 217 (E.D. Pa. 2012) ("Resolving the allegations surrounding [defendant's] alleged conduct in delaying generic entry will resolve issues that are 'central to the validity of each one of the claims in one stroke.'")

In my Prior Certification Decision, I noted that the Class Members' claims here depend on common evidence of whether or not Defendants engaged in anticompetitive behavior to limit the entry of generic competitors. Vista Healthplan, 2015 WL 3623005, at *14. At this stage, that common question remains. Accordingly, I find that commonality has been satisfied.

3.   Typicality

The third Rule 23(a) factor considers typicality. "Typicality" aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Marcus, 687 F.3d at 597–98 (citing Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 158 n.13 (1982)). Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." Id. at 598. To determine

whether a named plaintiff is markedly different from the class as a whole, the court must address three distinct concerns:  "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class."  Id. at 598 (quoting In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009)).

The Third Circuit has set a "low threshold" for typicality, such that "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."  In re NFL, 821 F.3d at 428 (internal quotation marks omitted).  "[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members."  In re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D. Pa. 2001) (quotations omitted).

In my Prior Certification Opinion, I noted that typicality was established because both the named and absent Class Members maintained the same claims and legal theories—that the allegedly anticompetitive conduct of Cephalon and the Generic Defendants constituted a violation of state antitrust, consumer protection and unjust enrichment laws.  Vista Healthplan, 2015 WL 3623005, at *14.  I also found that there were no potential conflicts of interest.  Nothing in the record before me suggests anything to undermine these findings.  As such, I deem typicality satisfied.

4.    Adequacy of Representation

The last Rule 23(a) factor considers adequacy of representation.  "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class."  In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 393 (3d Cir. 2015).  The adequacy requirement has two components:  (1) the interests and incentives of the representative plaintiffs; and (2) the experience and performance of class counsel.  Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted).

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class.  Fed. R. Civ. P. 23(g); see also Dewey, 681 F.3d at 181 n.13 (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 12(g)).

As I found in my Prior Certification Opinion, there is no valid challenge to the adequacy of Class Counsel, all of whom have extensive experience handling complex class action litigation, particularly in the antitrust context.  Vista Healthplan, 2015 WL 3623005, at *15.  Class Counsel was appointed as Interim Class Counsel in August 2009, and has managed the case with efficiency and professionalism ever since.

As to the adequacy of the class representatives, I likewise harbor no doubts.  Again, as I found in my Prior Certification Opinion, there is no real probability of a conflict of interest among Class Members and "[a]ll [C]lass [M]embers have a common interest in maximizing classwide

damages." Id. at *16.  Any speculative concerns about damages allocation that presented during the litigation class certification proceedings are no longer a concern at this settlement stage of the case.

### B.    Rule 23(b)(3) Requirements

#### 1.    Predominance

The predominance requirement is similar to commonality and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  While commonality and predominance present similar considerations, the predominance standard is "far more demanding." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009) (quotations omitted). The plaintiff need not prove his claims for purposes of the predominance inquiry.  He must only show that he can establish the elements of his claim at trial by common, and not individualized, proof.  Sullivan v. DB Invs., Inc., 667 F.3d 273, 305 (3d Cir. 2011).

"Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those *questions* will be answered, on the merits, in favor of the class." Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 459 (2013) (emphasis in original). The merits underlying the cause of action need be considered only to the extent that they are "enmeshed" with the certification inquiry.  Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) (citations omitted).    "Put another way, what matters for purposes of the predominance determination is whether there are common questions, not common answers." In re Mushroom Direct Purchaser Antitrust Litig., 319 F.R.D. 158, 187–88 (E.D. Pa. 2016).  As such, to decide whether class-action treatment is appropriate, the court must "give careful scrutiny to the relation between common and individual questions." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036,

1045 (2016).  Common questions are those "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof."  Id. (quotation and alterations omitted).  Individual questions are those "where members of a proposed class will need to present evidence that varies from member to member . . . "  Id. (quotation omitted).

To assess predominance at the certification stage, a court must examine each element of the asserted legal claim "through the prism" of Rule 23(b)(3).  Marcus, 687 F.3d at 600 (quoting In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir. 2011)).  The plaintiff must "demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members."  Id. (quoting Hydrogen Peroxide, 552 F.3d at 311).  Thus, a court must predict how specific issues will play out at trial "in order to determine whether common or individual issues predominate in a given case."  Malack v. BDO Seidman, LLP, 617 F.3d 743, 746 (3d Cir. 2010) (quoting Hydrogen Peroxide, 552 F.3d at 311).

Here, the EPPs set forth antitrust violations and state consumer protection claims.  I address each individually.

a.      Antitrust Class

For the antitrust class, the EPPs must show that common issues predominate with respect to their ability to prove: (1) a violation of the antitrust laws; (2) antitrust impact from the violation, i.e. causation; and (3) measurable damages.  See Hydrogen Peroxide, 552 F.3d at 311.

With respect to the first element—antitrust violation—my Prior Certification Opinion found that predominance clearly existed.  Vista Healthplan, 2015 WL 3623005, at *16.  This finding continues to hold true at the settlement stage.  The United States Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer [] fraud or violations

of antitrust laws." <u>Amchem</u>, 521 U.S. at 625; <u>see also</u> <u>In re Warfarin</u>, 391 F.3d 516, 528 (3d Cir. 2004).  As a general rule, liability for anticompetitive conduct focuses on the defendants' actions, not the conduct of individual class members.  <u>In re Warfarin</u>, 391 F.3d at 528.  "The issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members."  <u>In re Wellbutrin</u>, 282 F.R.D. at 140.   Accordingly, I deem predominance satisfied on this element.

With respect to the third element of damages, the EPPs need to demonstrate that common issues predominate as to the element of "measurable damages" on a classwide basis.  <u>Hydrogen Peroxide</u>, 552 F.3d at 311–12 (citing 15 U.S.C. § 15).   "[T]he plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis."  <u>In re Wellbutrin</u>, 282 F.R.D. at 144.  Variation of damages between and among class members does not necessarily defeat predominance.  <u>In re Processed Egg Prods. Antitrust Litig.</u>, 312 F.R.D. 171, 203 (E.D. Pa. 2015).

In my Prior Certification Opinion, I found that the EPPs had demonstrated predominance with respect to antitrust damages.  <u>Vista Healthplan</u>, 2015 WL 3623005, at *22–25.  I noted that Plaintiff's economist, Dr. Hartman, presented a formulaic and well-established methodology by which to calculate damages on a class-wide basis.  <u>Id.</u> at *25.  As that is the same measure of damages to be used with the Settlement Class, I find that predominance is satisfied.

Finally, with respect to the second element of antitrust impact, the EPPs must demonstrate that they can prove by common evidence that the Class Members suffered an injury, or antitrust impact, from the antitrust violation.  <u>In re Processed Egg Prods.</u>, 312 F.R.D. at 183.  As to this

element—unlike with the previous elements—my Prior Certification Opinion declined to find that the EPPs had established predominance.  Vista Healthplan, 2015 WL 3623005, at *21. Specifically, I credited the testimony of Defendants' expert that numerous groups of uninjured persons remained within the class definition, including, for example:  TPPs that were uninjured due to capitation agreements[2] between the TPPs and pharmacies; TPPs that paid more for the generic than branded Provigil because they aggressively promoted generic substitution through their copayment structure; consumers with no out-of-pocket payment; and consumers who received no cost-benefit from switching to the generic.  Id. at *19–20.  I further noted that the EPPs had put forth no methodology using common evidence to identify these uninjured persons, meaning that every Class Member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' anticompetitive actions.  Id. at *19.

These concerns are no longer at issue for several reasons.

First, the EPPs have redefined the Settlement Classes to specifically exclude:  (1) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices, and (2) insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs.  These exclusions are specified on the Consumer Claim form, and in order to participate in the Settlement, Class Members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions.  (Meltzer Decl., Ex. 4, at exhs. C and D.)  This process carves out the uninjured individuals and eliminates some of my prior concerns about the inclusion of uninjured persons or entities.

---

[2]   According to the EPPs' expert, W. Paul DeBree, a "capitation contract" is an agreement that provides for the payment of a flat fee for each covered individual.  (Expert Report of W. Paul DeBree ("DeBree Report"), ECF No. 586-11, ¶ 35.)

Second, as defined, the Settlement Classes condition class membership on a Provigil or modafinil "purchase," which requires claiming Class Members to verify that they paid for such a purchase or purchases.  (Id.)  This refined definition excludes consumers with no out-of-pocket payment for Provigil or modafinil.

Finally, the EPPs have produced the report of W. Paul DeBree, an expert in the Pharmacy Benefit Manager ("PBM") Industry, to address my previous concerns that the proposed litigation class included uninjured TPPs, such as (a) those with capitation agreements with pharmacies and (b) those that pay more for the generic than branded Provigil because they aggressively promote generic substitution through their co-payment structure.  At the time of the prior certification proceedings, the EPPs had no information about or response to the inclusion of these TPPs.  Mr. DeBree now explains that, with respect the first possible category of uninjured TPPs, capitation agreements have not existed in the TPP marketplace for over a decade and were not in place "in any meaningful way" during any part of the class period, making the existence of TPP Class Members with such plans very unlikely.  (Expert Report of W. Paul DeBree ("DeBree Report"), ECF No. 586-11, ¶ 35.)  As to second proposed category of uninjured TPPs, Mr. DeBree opines that "the theoretical possibility that a TPP would pay more for the generic modafinil than for the branded Provigil version of modafinil due to a co-pay structure is virtually non-existent.  As a practical matter the differential between branded and generic prices for expensive drugs, like Provigil, so substantially exceed the differential between the co-pays for each that the amount paid by the TPP for the branded drug will always be greater."  (Id. ¶ 47.)

Given this enhanced record with a new expert opinion, together with refined class definitions, I find that the EPPs have cured the problems of predominance found within the proposed litigation class.  Indeed, unlike previously "where the certification inquiry was set against

the backdrop of an impending trial, here we are not as concerned with 'formulat[ing] some prediction' as to how this element of [an antitrust] violation would 'play out' at trial . . . 'for the proposal is that there be no trial,' . . . and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones." In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269 (3d Cir. 2009) (internal quotations omitted).  Accordingly, for purposes of certifying a settlement class, I find that the element of predominance is satisfied.

### b.    State Unjust Enrichment/Consumer Protection Class

With respect to the state unjust enrichment/consumer protection claims, I previously found that predominance could not be satisfied due to material differences in state law.  Vista Healthplan, 2015 WL 3623005, at *33–34.  Specifically, I remarked that because of the variations in state law, combined with the EPPs' inability to account for those differences during trial, common issues did not predominate.  Id.

This concern is no longer relevant at the settlement class stage.  "Confronted with a request for settlement-only class certification, a district need not inquire whether the case, if tried, would present intractable management problems."  Amchem Prods., 521 U.S. at 620.  "[V]ariations [in state laws] are irrelevant to certification of a settlement class since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws."  Sullivan, 667 F.3d at 303 (internal quotations omitted) (alterations in original).  Accordingly, I find that the state law variations do not defeat predominance as to the state unjust enrichment/consumer protection class.

2.      <u>Superiority</u>

In addition to predominance, plaintiffs seeking certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  To determine whether plaintiffs have met their burden on superiority, courts consider "class members' interests in pursuing separate actions, the extent of any independent litigation already begun by class members, the desirability of concentrating the litigation in this forum, and the difficulties likely to be encountered in the management of a class action."  <u>In re Mushroom</u>, 319 F.R.D. at 208 (quotations omitted).  "In settlement situations, the superiority requirement arguably translates into the question whether the settlement is a more desirable outcome for the class than individualized litigation, and may assure that the settlement has not grossly undervalued plaintiffs' interests."  <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 192 (3d Cir. 2001) (citing  <u>G.M. Trucks</u>, 55 F.3d at 796).

In my Prior Certification Opinion, I found that superiority was not met because the EPPs had failed to offer a manageable and efficient way to instruct the jury on the important substantive differences in the various states' laws.  As noted above, however, that litigation manageability concern is no longer an issue as the Settlement resolves the case without trial.  Moreover, and perhaps more importantly, I note that many of the individual Class Members have smaller damage awards, which they would likely not individually litigate against the behemoth pharmaceutical companies that comprise the Defendants.  <u>See</u> <u>In re Namenda Direct Purchaser Antitrust Litig.</u>, 331 F. Supp. 3d 152, 220 (S.D.N.Y. 2018) ("Class treatment is appropriate in such 'negative value cases,' in which each class members' interest in the litigation is less than the cost to maintain an individual action.").  The Settlement therefore provides monetary remuneration for individuals and

small health plans who would likely otherwise have no recovery.   Accordingly, I deem the superiority element satisfied.

### C.   <u>Ascertainability</u>

The final element that I must consider regarding certification of the Settlement Classes is whether the classes are ascertainable.

"[A]scertainability" is closely tied to the requirement that plaintiffs provide a proper class definition.  <u>Byrd v. Aaron's, Inc.</u>, 784 F.3d 154, 164 (3d Cir. 2015).  "A trial court . . . needs a class to be 'defined with reference to objective criteria' and some assurance that there can be 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition,' in order to rigorously analyze the explicit Rule 23(a) and (b) certification requirements."   <u>Id.</u> at 164–65 (internal citations omitted).   The separate ascertainability requirement ensures that class members can be identified after certification and, therefore, "prepares a district court to direct to class members the best notice that is practicable under the circumstances."  <u>Id.</u> at 165 (internal quotation marks omitted).  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  <u>Marcus</u>, 687 F.3d at 593.

The Third Circuit has clarified that the ascertainability inquiry is "narrow."  <u>Byrd</u>, 784 F.3d at 165.  "If defendants intend to challenge ascertainability, they must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements."  <u>Id.</u> "[A]scertainability only requires the plaintiff to show that class members can be identified." <u>Carerra v. Bayer Corp.</u>, 727 F.3d 300, 308 n.2 (3d Cir. 2013).  The proposed method for identifying class members must be "administratively feasible," meaning that "identifying class members is a

manageable process that does not require much, if any individual factual inquiry."  Carrera, 727 F.3d at 307–08 (quotations omitted).

In my Prior Certification Opinion, I found that the EPPs had failed to present a clear methodology to identify Class Members and distinguish Class Members from persons that fell within an exclusion.  Vista Healthplan, 2015 WL 3623005, at *10.  I further found that the EPPs had not established any administratively feasible approach that would be effective without extensive individualized inquiry and mini-trials.  Id.

Here, the revised class definitions and Notice Program obviate all of my previous ascertainability concerns.  As detailed above, the Classes were re-defined to exclude (1) insured individuals covered by plans imposing a flat dollar co-pay that was the same dollar amount for generic as for brand drug prices, and (2) insured individuals who purchased only generic modafinil pursuant to a fixed co-pay applicable to generic drugs.  These exclusions are specified on the Consumer Claim form and, in order to participate in the Settlement, Class Members must swear in their claim forms, under penalty of perjury, that they do not fall within such exclusions.  (Miller Decl., Exs. C & D.)  The proposed Settlement Classes specifically condition class membership on a Provigil or modafinil "purchase" and require claiming Class Members to verify that they paid for such a purchase.  (Id.)

Moreover, the Notice Program has borne out the desired results of identifying Class Members.  As set forth above, the Notice Program consisted of (a) direct notice to potential Class Members identified through subpoenas to twenty-five providers of retail pharmacy services and pharmacy benefits managers, including mail-order pharmacies; (b) direct notice to potential members of the Settlement Class identified through the A.G. Provigil Settlement; (c) publication notice in national magazines; (d) internet banner and newsfeed ads on multiple networks; (e)

distributing notice via PR Newswire's US1 Newsline; (f) developing and launching a dedicated informational website for the Settlement at ProvigilSettlement.com; and (g) establishing a dedicated toll-free telephone number.  As a result of this Notice Program, over 40,000 eligible claimants have been identified.  As represented by the EPPs' Class Counsel, all money obtained from the Settlement will be distributed, leaving no surplus.

Ultimately, I find that the EPPs have met their burden of setting forth objective criteria by which the Settlement Classes are defined and providing reasonable assurance of a reliable and administratively feasible mechanism for determining whether putative Class Members fall within the class definition.  My previous concerns about the need for individualized fact-finding or mini-trial to identify Class Members has been adequately addressed by the EPPs.

### D.    Conclusion as to Class Certification

Following a "rigorous analysis," I find that the EPPs have proven that class certification is warranted and proper.  The EPPs have established all of the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy of class representation.  Moreover, common, class-wide issues will predominate, and the EPPs have adduced sufficient classwide evidence to prove anticompetitive conduct, antitrust impact, and damages.  Finally, I conclude that a class action is a superior method to fairly and efficiently adjudicate this controversy, and that the class is ascertainable.  Accordingly, the EPPs' Motion for Class Certification of the Settlement Classes will be granted.

### E.    Appointment of Interim Class Counsel as Class Counsel

Having certified the Settlement Class, I must now appoint Class Counsel.

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done

in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g); see also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 n.13 (3d Cir. 2012) (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 23(g)).

I have already twice determined that the three firms that were appointed as Interim Class Counsel—Spector Roseman & Kodroff, Kessler Topaz Meltzer & Check, and Criden & Love— are qualified under Rule 23(g) factors. I have again reviewed these factors in the course of the adequacy of representation factor of Rule 23 and found that these firms have actively, efficiently, and competently litigated this case for over twelve years. They have applied their past experience in handling antitrust class actions and their extensive knowledge of the applicable law, and they have committed extraordinary resources to this matter. Having no reason to doubt the collective experience of Interim Class Counsel, I appoint these firms as Class Counsel.

## IV. FAIRNESS OF THE SETTLEMENT

After determining that a proposed settlement class may properly be certified under Rule 23, the court must evaluate the fairness of a proposed class action settlement under Rule 23(e). See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) ("'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.'" (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)).

Where, as here, "settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously," the court must protect absentee class members by applying an "even more rigorous, heightened standard." In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (internal quotation marks omitted) (In re Warfarin, 391 F.3d 516, 534 (3d Cir. 2004)).  However, the Third Circuit, in In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001), has directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Id. at 232 n.18; see also In re Warfarin, 391 F.3d at 535.

In Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit "identified certain factors which district courts may employ in informing their discretion before granting final approval to  the class action settlement." Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing Girsh).  "[T]he district court must make findings as to each of the  nine Girsh factors in order  to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)." In re Pet Food Prods., 629 F.3d at 350. The Girsh factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157.

Subsequently, in In re Prudential Insurance Company America Sales Practice Litigation Agent Actions, 148 F.3d 283 (3d Cir. 1999), the Third Circuit cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional Girsh factors" when appropriate.  Id. at 323.  The additional factors for consideration cited by the Prudential Court include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id.  These Prudential factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms."  In re Pet Food Prods., 629 F.3d at 350.

Finally, in In re Baby Products Antitrust Litigation, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class."[3]  Id. at 174.  "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards

---

[3]      In In re Baby Products, the Third Circuit was addressing a proposed settlement with a *cy pres* distribution.  It is not entirely clear whether this factor applies only to those settlements that include *cy pres* distributions or whether it should be considered in all class settlements.  Although the Settlement here does not include a *cy pres* component, for the sake of comprehensiveness, I will address the Baby Products direct benefit consideration here.

compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings. Girsh, 521 F.2d at 156. There is an overriding public interest in settling class action litigation, and it should therefore be encouraged. See G.M. Trucks, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years"). As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig., No. 09-md-2034, 2019 WL 4645331, at *10 (E.D. Pa. Sept. 24, 2019) (quoting In re Baby Prods., 708 F.3d at 175)).

With these standards in mind, my review of the Settlement here entails several steps. I will first address whether the Settlement is entitled to a presumption of fairness as described in the Cendant case. I will then individually address the Girsh, Prudential and Baby Products factors.

### A.    Presumption of Fairness

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Cendant, 264 F.3d at 232 n.18; see also In re NFL, 821 F.3d at 436.

All of these factors are satisfied here.  First, it is undisputed that the settlement negotiations occurred at arm's length.  The parties began settlement negotiations through two full days of mediation conducted by United States Magistrate Judge David R. Strawbridge and the two Special Masters he selected.  (Meltzer Decl. ¶ 28.)  Over the ensuing pendency of the litigation, settlement discussions occurred intermittently, ultimately culminating in the Settlement after the denial of class certification.  (Id. ¶¶ 29–32.)

Second, sufficient discovery unequivocally occurred here.  Discovery took place over the course of over twelve years and involved the review and analysis of more than five million pages of documents, over 180 depositions including those of all five named Plaintiffs, court hearings on discovery, and extensive motion practice.  (Id. ¶¶ 22–24.)

Third, as noted above, Class Counsel, who are the proponents of the Settlement, are highly experienced in similar class litigation.  As I found in my Prior Certification Opinion, Class Counsel has extensive experience handling complex class action litigation, particularly in the antitrust context.  Vista Healthplan, 2015 WL 3623005, at *15.

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable.  Nearly 40,000 Settlement Class Members have filed claims to participate in the Settlement, only eighteen potential Class Members have sought exclusion from the Class, and only three individuals have filed generalized objections.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness.  While this presumption does not obviate the need for scrupulous analysis under the Girsh, Prudential, and Baby Product factors, it does skew the analysis in favor of approving the Settlement.

**B.**   **Application of the *Girsh* Factors**

  1.   Complexity, Expense, and Likely Duration of the Litigation (Factor 1)

"The first factor 'captures the probable costs, in both time and money, of continued litigation.'"  In re Warfarin, 391 F.3d 535–36 (quoting In re Cendant, 264 F.3d at 233)); see also In re NFL, 821 F.3d at 437.

This suit involves complicated antitrust and patent issues in the realm of pharmaceutical manufacturing.  "An antitrust class action is arguably the most complex action to prosecute . . ." In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quotations omitted); see also In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive.").  The Settlement therefore avoided the need for a difficult and expensive multi-week trial involving numerous Daubert motions, multiple motions *in limine*, fact witness testimony, and costly expert witness testimony in scientific and regulatory areas.  Moreover, given the significant amount of money at stake, the likelihood of appeal by either side was high, further multiplying the projected expenditures.  Because such private resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Settlement.  McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015).

  2.   Reaction of the Potential Class Members to the Settlements (Factor 2)

The second Girsh factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement."  In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254 (D. Del. 2002) (quoting In re Prudential, 148 F.3d at 318).

Here, the Notice to potential Class Members stated that Requests for Exclusions had to be mailed to the Settlement Administrator so that they were received by December 6, 2019.  (Miller

Decl., ECF 600-4, ¶ 21 & Ex. C, ¶ 15.)  The Settlement Administrator received a total of eighteen

Requests for Exclusion.  (Supp. Miller Decl. ¶ 6.)  By contrast, nearly 40,000 Settlement Class

Members have filed claims to participate in the Settlement.

Three objections to the proposed Settlement were filed, none of which I find warrants non-approval of the Settlement.

First, Mr. Barry Balach challenges the Cephalon Settlement because it does not include Nuvigil purchases in those for which Class Members may recover.  He asserts that any settlement that does not take into account his out-of-pocket costs for Nuvigil is inadequate.  He also believes the amount of the Settlement is insufficient.  (Barry Balach Obj., ECF No. 601.)

I note that the EPPs' Amended Complaint originally alleged that Cephalon's launch of Nuvigil was part of an illegal "product hop" and that Nuvigil purchases should be recoverable damages.  The EPPs' Class Counsel, however, averred that evidence received during discovery revealed the weakness of the product hop allegations, and that damages related to Nuvigil purchases "would be low if not impossible to prove."  (EPPs' Suppl. Br. 4.)  Indeed, Nuvigil purchases were not recoverable in either the Direct Purchaser Settlement or the States' Attorneys General Settlement.  As I find the decision to exclude Nuvigil purchases from the Settlement to be reasonable, I will overrule Mr. Balach's objection.

The second objection comes from Mr. Carlton Davis, who contends that the Cephalon Settlement will be an insufficient deterrent because he understood that Cephalon "accrued as much as $47.25 billion in overcharges" and that the Settlement amount will not impede the illicit conduct because it is a "mild slap on the wrist to a greed-addicted company."  He also believes that the Settlement "does nothing to address the real cost inflicted" on society and is "woefully inadequate to compensate consumers" because only $20 million is going to be paid out to the class.  He urges

that he should be compensated for his time and expenses in pursuing his claim, in the amount of $8,000.  (Carlton Davis Obj. ECF No. 602.)

I find no basis to sustain the objection for several reasons.  First, Mr. Davis's objection relies on an overly-inflated overcharge number.  As noted by the EPPs, the overcharge damages were not calculated to be $47.25 billion, as Mr. Davis believes, but rather were calculated, by the EPPs' expert, to be approximately $1.244 billion.  (Meltzer Decl. for Preliminary Approval, ECF No. 586, Ex. 18.)  Moreover, the Settlement amount itself is substantial.  It gives approximately $66 million to the EPP class, which, combined with $77 million obtained from the separate group of Settling Health Plans ("SHP"s), results in a total settlement of $143 million to the entire group of end-payors for whom the litigation was originally commenced.  The amount of the Settlement is even more substantial when viewed in light of the fact that the EPPs were denied class certification, meaning that a collective recovery through litigation would have been impossible. Finally, Mr. Davis's concerns as to the amount of attorneys' fees are unfounded, as I will discuss later in this Opinion.

Mr. Davis's request for $8,000 in personal attorneys' fees—unaccompanied by any documentation—has no legal basis.  "Absent a showing that the objector substantially enhanced the benefits to the class under the settlement, the objector is not entitled to a fee."  In Rent-Way Secs. Litig., 305 F. Supp. 2d 491, 520 (W.D. Pa. 2003).  As Mr. Davis has not demonstrated that his participation has enhanced the benefits to the class under the settlement, he is not entitled to any fees.  Accordingly, I will overrule Mr. Davis's objection as well.

Finally, Mr. Daniel Dunham[4] generally objects that "[t]he actions alleged, if true, would require penalties in excess of profit to have any deterring effect" and suggests that "the fund to be

---

[4]     Mr. Dunham filed an objection on the docket of the related case brought by the California Attorney General, but clearly intended to address the EPP Settlement.

distributed be much larger, since victims can obtain nothing more than what was lost due to the alleged behavior, and the total judgment has a finite limit." He believes that "there is no reason a company should retain any of the profit that is earning using unlawful methods." (Daniel Dunham Obj., ECF No. 607-4.)

This objection is meritless for the same reasons applied to Mr. Davis's objection. Moreover, Mr. Dunham has, contrary to his objection, filed a claim form to participate in the Settlement. Accordingly, I will overrule this objection as well.

While I appreciate and carefully consider the objections of those who take the time to participate in what is generally a lawyer-driven settlement, I do not find that any of the three objections before me raise valid concerns to the fairness and adequacy of the EPP Settlement. By contrast, the fact that approximately 40,000 individuals have filed forms to participate in the Settlement reflects significant support for the Settlement. As a "small proportion of objectors does not favor derailing [the] settlement," Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993), I find that this factor weighs in favor of approval.

### 3.    Stage of Proceedings and Amount of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery competed—"courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55 F.3d at 813). "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, twelve years of active litigation transpired during which extensive discovery was exchanged, over 180 depositions were taken, expert reports were obtained and exchanged, and

vigorous motion practice was pursued.  Only after the denial of class certification and rulings on summary judgment were issued did the parties reach the Settlement.  Moreover, the parties had the benefit of rulings in the related cases by the States' Attorneys General and the Direct Purchasers, as well as my ruling in the patent infringement case brought by Apotex.  Given this record, I find that the parties had a well-developed appreciation of the merits of the case prior to negotiation.

4.      <u>Risks of Establishing Liability & Damages (Factors 4 and 5)</u>

"These factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  <u>In re Warfarin</u>, 391 F.3d at 537.

As I have repeatedly noted over the twelve-year litigation period, a favorable outcome was far from guaranteed to the EPPs.  The EPPs put forth novel theories of antitrust liability in an ever-changing legal landscape.  Defendants—three large pharmaceutical companies—had immeasurable resources to proceed to and through trial.  Even if the EPPs were successful in establishing an unlawful reverse-settlement payment <u>Actavis</u> scheme with respect to Provigil, they faced an uncertain battle in establishing causation and damages.  "The dispute over damages would likely have resulted in an expensive battle of the experts and there was no way to anticipate a jury's response to intricate economic data."  <u>McDonough</u>, 80 F. Supp. 3d at 644.

By the same token, I note that while the EPPs' likelihood of prevailing was far from certain, "there is no indication that this case was brought in bad faith simply to generate attorneys' fees, or that the case [was] too weak to succeed under most circumstances."  <u>Reibstein v. Rite Aid Corp.</u>, 761 F. Supp. 2d 241, 253 (E.D. Pa. 2011).  Ultimately, the Settlement provided the certainty of a

$66 million immediate recovery without subjecting the EPPs to the rigors of a difficult trial.  As such, I find these factors weigh in favor of the Settlement.

     5.     <u>Likelihood of Obtaining and Keeping Class Certification Through Trial (Factor 6)</u>

The sixth <u>Girsh</u> factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." <u>In re Warfarin</u>, 391 F.3d at 537 (internal quotations & citation omitted).  Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." <u>Id.</u> (citation omitted).

This factor weighs heavily in favor of approval.  As noted above, I had already denied class certification to the EPPs, meaning that any trial in this case would have been only on behalf of the five individual EPPs and any recovery would have been limited to their individual damages. Depending on the outcome of that trial, either the named Plaintiffs would have had to appeal my class certification decision, or the non-named potential Class Members would have had to decide whether to pursue their own costly individual cases against the Defendants.  Given the relatively small amounts of damages that these individual plaintiffs each sustained, individual litigation would not likely be feasible.

By contrast, the Settlement here guarantees some recovery to all of the potential Class Members, both named and unnamed.  As such, this factor weighs in favor of approving the Settlement.

     6.     <u>Ability of Defendants to Withstand a Greater Judgment (Factor 7)</u>

The ability of the Defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the

40

defendant's financial circumstances do not permit a greater settlement." <u>Reibstein</u>, 761 F. Supp. 2d at 254.  The Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the Consumer and TPP Class Members are entitled to under the theories of liability that existed at the time the settlement was reached." <u>In re Warfarin</u>, 391 F.3d at 538.

Here, there is no question that the Defendants' total resources far exceed the Settlement amount, and Defendants did not profess any inability to pay during settlement negotiations.  That factor does not appear to have come into play during the settlement negotiations.  Defendants' ability to pay is therefore irrelevant in determining the fairness of the Settlement and I decline to give it any weight.

> 7.   <u>Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)</u>

"The last two <u>Girsh</u> factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case.  The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  <u>In re Warfarin</u>, 391 F.3d at 538 (citations omitted). In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  <u>In re Prudential</u>, 148 F.3d at 322 (quoting <u>G.M. Trucks</u>, 55 F.3d at 806).  In conducting this evaluation, it is recognized "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the

litigation." In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4, 2001). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh." In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), aff'd, 264 F.3d 201 (3d Cir. 2001).

The Settlement here is reasonable in light of the best possible recovery.  As set forth above, the Settlement provides $65,877,600 for Class Members, which amount was negotiated simultaneously with the $77 million settlement from the Cephalon Parties for the Settling Health Plans.  The EPPs' expert, Dr. Hartman, calculated the total overcharge damages as $1.244 billion. (Meltzer Decl., ECF No. 586, Ex. 18 ¶ 44.)   The total EPP Settlement of $142,877,300 is approximately 11.5% of that best possible recovery situation.  Courts have approved settlements in and around this range.  See In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (citing in part In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); Erie Forge and Steel, Inc. v. Cyprus Minerals Co., No. 94-404, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); Fox v. Integra Financial Corp., No. 90-1504 (W.D. Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); In re Four Seasons Sec. Litig., 58 F.R.D. 19, 36–37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million)).

The Settlement becomes even more reasonable when considered in light of the attendant risks of litigation.  The combined Settlement of almost $143 million (EPP Class plus SHPs) was achieved after twelve years of litigation.  As noted above, class certification had been denied, meaning that the best case recovery scenario—which accounted for damages to an entire class— could not be obtained through a singular trial.  And Defendants had their own competing economic experts who would have challenged the EPPs' damages calculation at every angle, potentially lowering the amount of recoverable damages.  "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness."  Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); see also In re NFL, 821 F.3d 410, 440 (3d Cir. 2016)  (holding that, in considering the eighth and ninth Girsh factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth Girsh factors weigh in favor of approval of the Settlement.

### 8.    Summary of the *Girsh* Factors

In sum, Girsh factors one through six, eight, and nine favor approval of the EPP Settlement. Factor seven—the ability of the Defendants to withstand a greater settlement—is neutral and does not persuade me either way.  Although the Girsh factors are simply a guide, I find that, under these considerations, the Settlement is fair and reasonable.

C.      **The *Prudential* Factors**

The Prudential factors involve multiple additional considerations, including:  (1)  "the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable."  In re Prudential, 148 F.3d at 323.  Only the Prudential factors relevant to the litigation in question need be addressed.  Id. 323–24; In re Cigna-American Specialty Health Admin. Fee Litig., No. 16-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues—substantially mirrors Girsh factor three, the stage of the proceedings.  Under this factor, the advanced development of the record weighs in favor of approval.  See Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken.").  The Settlement here came on the heels of twelve years of active litigation during which extensive discovery was exchanged, over 180 depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued.  Class Counsel had the benefit of assessing the strength and weaknesses of the case based on this

discovery, the Defendants' motions, and the Supreme Court ruling in <u>Actavis</u>. Moreover, the Settlement resulted from extensive negotiations with multiple mediators who had the benefit of an expansive overview of the case. Accordingly, I find that the Settlement was premised on a significantly mature record.

Factors two and three look at the outcomes of claims by other classes and other claimants. Defendants here faced antitrust claims from multiple other claimants and classes including the Federal Trade Commission, generic manufacturer Apotex, a group of retailer pharmacy chains, a class of direct purchaser plaintiffs, and several States' attorneys general, all of whom reached settlements allowing for the recovery of overcharge damages. In addition, the State of California has a pending settlement that allows its claimants to recover full reimbursement for their purchases of Provigil and/or modafinil. Consistent with these settlements, the Settlement here likewise permits Class Members to potentially recover the full amount of overcharge damages they suffered as a result of the alleged anticompetitive conduct. Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement. The Settlement here specifically advised potential class members that they had the option to be excluded from the class. (Miller Decl., Exs. C & D.) As of the date of the Final Fairness Hearing, only eighteen class members had opted out of the Settlement. (Supp. Miller Decl. ¶¶ 5–6.) The release of claims against Defendants does not apply to those Plaintiffs who opt out.

Pursuant to the fifth factor—the reasonableness of attorneys' fees—the Notice Program specifically advised potential Class Members that:

> Class Counsel will request an award from the Court for attorneys' fees of up to one-third of the total amount of the Settlement funds

plus any accrued interest, plus reimbursement for the costs and expenses they advanced in litigating the case. All awards for attorneys' fees and expenses shall be paid from the Settlement Funds after the Court approves them. In addition, pursuant to an agreement between Class Counsel and the lawyers for the Settling Health Plans or SHPs (a group of TPPs who separately settled with the Cephalon Defendants), Class Counsel received 40% of the fees paid to the SHP's lawyers from their separate agreement with the Cephalon Defendants. The fees paid pursuant to this agreement are separate from any attorney fees the Court awards to Class Counsel from the Settlement Funds in this case. Further, also pursuant to the agreement between the SHPs' lawyers and Class Counsel, Class Counsel will pay the SHPs' lawyers approximately 32.2% of any fees awarded by the Court in connection with the settlement with the Cephalon Defendants.

(Miller Decl., Exs. C & D.) While the reasonableness of these requested fees is discussed in more detail below, I find—for purposes of approving the fairness of the Settlement—that the notice to the Class Members about the requested fees was reasonable.

Finally, under the sixth factor, I find that the procedure for processing individual claims is both fair and reasonable. In order to submit claims, Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms including pharmacy records, an insurance EOB (explanation of benefits) form, or letter from the claimant's doctor. (Miller Decl., Ex. C.) Absent a proof of purchase, a Class Member can seek help from the Settlement Administrator to file a valid claim. (Id.) The Settlement Administrator will then process all submitted claims to determine whether there are any deficiencies and, if so, to notify the Claimant how to cure the deficiency. (Meltzer Decl., Ex. 5.) Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which ones are authorized for approval and which ones are ineligible. (Id.) Upon final approval of the Settlement, the approved Settlement Notice Costs, Settlement Administration Costs, Escrow Administration

Costs, taxes, approved attorneys' fees and costs, and lead plaintiff incentives shall be paid from the settlement funds. The Settlement Administrator shall then pay all authorized Consumer Claims from the final Consumer Distribution Fund allowing claimants to receive up to 100% of their authorized Consumer Claim, depending on the sufficiency of the funds available and whether the claimant has received reimbursements from either the State Attorney General settlement or the California Attorney General settlement.

Overall, the <u>Prudential</u> factors raise no concerns regarding the fairness of the Settlement. The Settlement was reached at mature stage of the litigation, and the Settlement's terms appropriately set forth how to file a claim, how the monies will be distributed, how to opt out of the Settlement, and what the potential attorneys' fees and costs awards could be. Ultimately, the Settlement is consistent with those obtained by the other claimants in the related actions. As such, I find that the <u>Prudential</u> factors favor approval of the Settlement.

### D. *Baby Products* Direct Benefit Factor

The final factor I must consider in my analysis of the Settlement's fairness is "the degree of direct benefit provided to the class." <u>In re Baby Products Antitrust Litig.</u>, 708 F.3d 163, 174 (3d Cir. 2013). As noted above, "[i]n making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." <u>Id.</u>; <u>see also</u> <u>In re Google Inc. Cookie Placement Consumer Privacy Litig.</u>, 934 F.3d 316, 329 (3d Cir. 2019).

Here, the Plan of Allocation provides that:

- The separate settlement funds provided by each of the Cephalon Settlement, the Mylan Settlement, and the Ranbaxy Settlement shall be deposited into three separate accounts.

- From those accounts, there will be several deductions made on a *pro rata* basis:

- Any and all allowed costs (including Settlement Notice costs, Settlement Administration costs, Escrow Administration costs, and taxes).
- Any allowed class attorneys' fees and costs.
- Court-authorized incentive awards to the named Plaintiffs.
- Any future Settlement Administration Costs, Escrow Administration costs, and taxes likely to be incurred through completion of the claims process.

- Following these disbursements, the Settlement Administrator shall combine the remaining funds in the three accounts (the "Net Class Settlement Fund"), which will be used to pay Consumer and TPP claims that have been processed and authorized by the Settlement Administrator in accordance with the Plan of Allocation.

- The Net Class Settlement Fund will be so allocated and disbursed to "Authorized Consumer Claimants" (who will receive 14% of the net Class Settlement Fund) and "Authorized TPP Claimants" (who will receive 86% of the Net Class Settlement Fund) by the Settlement Administrator, under the supervision of Class Counsel and upon Court approval.

- If there are sufficient funds, each Authorized Consumer Claimant shall receive 100% of their Authorized Consumer Claim (reduced by money that Authorized Consumer Claimant has received in any other modafinil settlement).

- If there are insufficient funds to pay each Authorized Consumer Claimant 100% of their Authorized Consumer Claim, then each Authorized Consumer Claimant shall receive a *pro rata* share of the fund.

- If, after all Authorized Consumer Claimants are paid 100% of their claims, funds remain in the Consumer Distribution Fund, those remaining funds shall be added to the TPP Settlement fund and paid out to Authorized TPP Claimants.

As discussed above, Class Members will be entitled to recover up to 100% of their purchase price if sufficient funds are available. Potential Class Members have already received sufficient notice with detailed information and an easy-to- complete claim form. Ultimately, this Settlement prioritizes the maximum number of potential Class Members receiving a direct benefit from the litigation. In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig., 333 F.R.D. 364, 385 (E.D. Pa. 2019) (approving class settlement where, "[d]espite a weak case, Class Counsel continued to prioritize obtaining a direct benefit for potential Class Members and ultimately achieved a Settlement with the potential to directly benefit an estimated 3.5 million consumers.").

E.      **Conclusion as to Fairness of the Settlement**

In light of the foregoing, I find that the EPP Settlement is fair, reasonable, and adequate. Lending the Settlement the requisite presumption of fairness, I note that all but one of the Girsh factors, all of the Prudential factors, and the Baby Products direct benefit consideration weigh in favor of approval.  Accordingly, I will grant final approval to Settlement.

V.      **APPROVAL OF THE PLAN OF ALLOCATION**

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself.  McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015).  "Therefore, the proposed plan needs to be fair, reasonable and adequate." Id. (citing In re Baby Prods., 708 F.3d at 174).  "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'"  Sullivan v. DB Investments, Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000).  Repeatedly, courts have approved of similar plans of allocation.  See, e.g., In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying purchases of the brand name drug); Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period,

net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses . . . in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade.  Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. Jan. 4, 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

Here, the proposed Plan of Allocation is fair, reasonable, and adequate as it provides a straightforward method for determining each Class Member's *pro rata* share of the Net Settlement Fund and then reimburses Class Members based on the type and extent of their injuries.  As set forth in more detail above, the process for submission of claims is simple as Class Members need only provide information regarding the total amount they paid for Provigil or modafinil from June 24, 2006 through August 8, 2019, with only one proof of purchase, which can take any number of forms.  Once all non-deficient claims are collected, the Settlement Administrator will review the claims to determine which claims are authorized for approval or are deemed ineligible.

The Settlement funds from each of the three Defendants will be subject to deductions for approved attorneys' fees, administrative costs, litigation costs, and incentive payments.  The net amounts will then be combined into a single Class Settlement Fund.  Authorized Consumer Claimants will receive 14% of Net Settlement Fund and Authorized TPP Claimants will receive 86% of the Net Settlement Fund.  The amounts will be allocated on a *pro rata* basis and all Class Members will receive a proportionate award based on the amounts they paid for Provigil and

modafinil during the class period, up to 100% depending on the number of claims.  All of the net

settlement amounts will be reimbursed to Class Members.

I will therefore approve the proposed Plan of Allocation.

## VI.    MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS

The final portion of my review of the Settlement requires consideration of the EPPs'

Motion for (1) an award of attorneys' fees, (2) reimbursement of litigation expenses, and (3)

incentive awards for the class representatives.

### A.    Attorneys' Fees

The EPPs first seek an award of attorneys' fees in the amount of $21,959,200 plus accrued

interest—approximately one-third of the Class Settlement Fund—on behalf of Class Counsel and

two other participating firms (Finklestein Thompson and the Law Offices of Robert Sink).[5]

Under Federal Rule of Civil Procedure 23(h), at the conclusion of a successful class action,

class counsel may apply to a court for an award of attorneys' fees.  The amount of

an attorneys' fee award "is within the district court's discretion so long as it employs

correct standards and procedures and makes finding of fact not clearly erroneous[.]"  Sullivan v.

DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

"'[A] private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve

a fund to which others also have a claim, is entitled to recover from the fund the costs of his

---

[5]  I note that Class Counsel has an agreement with the SHPs to share fees related to the Cephalon Settlement.  Specifically, under the agreement, Class Counsel has already received forty percent of the SHP Counsels' fee from that settlement, for a total of $4,960,000.  In exchange for this advanced payment, Class Counsel is obligated to provide SHP's Counsel 32.21% of the fees awarded in this matter related solely to the Teva portion of the settlement.  This private agreement has no impact on my decision here.

litigation, including attorneys' fees.'" In re Cendant, 404 F.3d at 187 (quoting G.M. Trucks, 55 F.3d 768, 820 n.39).

In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method.  The percentage-of-recovery method is generally favored in common fund cases, such as the one here, because it allows courts to award fees from the fund "in a matter that rewards counsel for success and penalizes it for its failure." Prudential, 148 F.3d at 333 (internal quotations omitted); see also In re Rite Aid Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (finding that the "percentage of the fund" method is the proper method for calculating attorneys' fees in common fund class actions in this Circuit.); Kirsch v. Delta Dental of New Jersey, 534 F. App'x 113, 115 (3d Cir. 2013) ("The percentage of recovery method is generally favored in common fund cases . . .") (quotations omitted).

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 1990), the Third Circuit directed that, when analyzing a fee award in a common fund case, a district court must consider several factors, including:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
> (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Id. at 195 n. 1.  This list was not intended to be exhaustive.  Id.

In In re Prudential, the Third Circuit identified three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, (2) the percentage fee that would have been negotiated had the case been subject to

a private contingent fee agreement at the time counsel was retained, and (3) any "innovative" terms of settlement.  Id. at 336–40.

Ultimately, in reviewing an attorneys' fees award in a class action settlement, a district court should consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case.  The fee award reasonableness factors "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest."  In re Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1).  In cases involving extremely large settlement awards, district courts may give some of these factors less weight in evaluating a fee award.  See In re Cendant Corp. Litig., 264 F.3d 201, 283–84 (3d Cir. 2001); In re Prudential, 148 F.3d at 339.  What remains important is that, in all cases, the district court "engage in robust assessments of the fee award reasonableness factors," In re Rite Aid, 396 F.3d at 302, recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements."  In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (internal quotations omitted); see also In re AT&T Corp., 455 F.3d 160, 165–66 (3d Cir. 2006).

Once all of the Gunter and Prudential factors have been considered, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method.  In re Prudential, 148 F.3d at 333.  More specifically, the district court should apply the percentage-of-recovery method and then do "an abridged lodestar analysis"— multiplying the number of hours reasonably worked on a case by a reasonable billing rate—and compare it against the percentage-of-recovery method.  In re Rite Aid, 396 F.3d at 305–06.  In doing so, the court can ensure that the percentage-of-recovery method does not yield too high or low of an award.  Id. at 306.

With these standards in mind, I consider each of the <u>Gunter</u> and <u>Prudential</u> factors and then cross-check the percentage-of-recovery amount against a lodestar analysis to provide an overall assessment of the reasonableness of the requested attorneys' fees.

      1.    <u>Gunter/Prudential Factors</u>

          *a.*      *Size of the Fund Created & Number of Persons Benefitted*

The Settlement Agreement establishes a total recovery of $65,877,600, from which administrative expenses, attorneys' fees, and costs must be paid.  <u>See</u> <u>Jackson v. Wells Fargo Bank, N.A.</u>, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (noting that "size of the fund" should include attorneys' fees, and administration expenses); <u>Lake Forest Partners, L.P. v. Sprint Commc'ns Co. L.P.</u>, No. 12-00999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013) (the size of the fund should include the "separate payment of attorney's fees and expenses, and the expenses of administration") (citing <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 479 (1980)).  Notice has been disseminated to thousands of potential Class Members through the Notice Program as described above, and nearly 40,000 Class Members have filed claims to date.

Class Counsels' requested fees in this case represent 33 1/3 % of the total recovery, which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit.  <u>See, e.g.</u>, <u>Esslinger v. HSBC Bank Nevada</u>, No. 10-3213, 2012 WL 5866074, at *12 (thirty percent fee award reasonable considering size of the fund); <u>In re Processed Egg Prods. Antitrust Litig.</u>, No. 08–2002, 2012 WL 5467530, at *7 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent (30%) fee award for $25,000,000.00 settlement); <u>In re Flonase Antitrust Litig.</u>, 291 F.R.D. 93, 104 (E.D. Pa. 2013) (citing cases and remarking that "[a] one-third fee award is standard in complex antitrust cases of this kind" and "is consistent with awards in other complex antitrust actions involving the

pharmaceutical industry") (quotations omitted).   Accordingly, this factor weighs in favor of finding the fee request reasonable.

<em>b.      Presence or Absence of Substantial Objections</em>

The Notice Program specifically advised potential Class Members that Class Counsel would request an award of attorneys' fees of up to one-third of the total amount of the Settlement funds, plus costs, all of which would be paid from the Settlement funds.  Despite this widespread notice, only three individuals filed objections.  Of those, only one objector—Carlton Davis— challenged the amount of the requested attorneys' fees.  Specifically, he stated that the Settlement was inequitable because "[o]ver 50% of [the settlement funds] is allocated to the state and private litigators to compensate for replenishing funds, for time spent, and expenses incurred."  He believed that "[f]unds need to be provided to us consumers for our time and expenses researching our cost, calculating our time, and our damages." (Carlton Davis Obj., ECF No. 602.)

This singular objection, standing alone, would not be sufficient for me to deny the requested fees.  Moreover, I note that, in their Supplemental Filing, the EPPs represented that a member of Class Counsel spoke with Mr. Davis by phone on January 27, 2000, to further explain the details of the Settlement.  During that phone call, Class Counsel addressed some of Mr. Davis's concerns.  Mr. Davis expressed appreciation for the call and advised that he had no objection to a one-third attorneys' fee award, indicating that he was aware that such amount was common in contingent fee cases.  (EPPs' Supp. Br., ECF No. 607, p. 6 n.6.)  Finally, I remain cognizant that nearly 40,000 individuals have submitted claims, thus tacitly indicating their approval for the Settlement and requested attorneys' fees.

c.      *Skill and Efficiency of Attorneys' Involved*

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Gunter, 223 F.3d at 198 (quotations omitted).  "The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."  Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) (quotations omitted).

As repeatedly discussed above, both in regard to class certification and with respect to the fairness of the Settlement, Class Counsel are skilled and effective class action litigators that have obtained a highly favorable settlement in an extremely complex case despite the fact that an end-payor litigation class was not certified.  I need not reiterate those same considerations again here. This factor therefore supports a 33 1/3% attorney fee award.

d.      *Complexity and Duration of the Litigation*

"[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the class by class counsel" are factors which "increase the complexity of class litigation."  In re Cendant Corp. PRIDES, 243 F.3d at 741.  All of those factors favor the requested fee award here.

First, the legal issues involved here were novel and complex, implicating both patent and antitrust issues.  Various groups of plaintiffs proceeded against Defendants under a reverse-payment settlement antitrust theory.  Several years into the litigation, that theory was significantly altered and shaped in the wake of the Supreme Court decision in FTC v. Actavis, Inc., 570 U.S. 136 (2013).  To further complicate matters, the case against Defendants involved complex patent issues under the Supreme Court case of Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965).

Second, discovery was extensive and far-reaching.  The parties proceeded through years of certification, fact, and expert discovery involving approximately five million pages of documents, over 180 depositions, and depositions of numerous experts.

Third, the case was hard-fought on both sides.  The parties briefed multiple, highly-contested motions, including motions to dismiss, discovery motions, certification motions, and motions for summary judgment.  Counsel spent approximately 41,000 hours on the litigation.

Finally, the case was subject to numerous delays that were out of the EPPs' control.  I first delayed the matter to conduct a patent infringement trial and resolve the underlying patent issues before reaching the antitrust issues.  Thereafter, the matter was delayed by the Supreme Court's impending ruling in Actavis.  Finally, after the Settlement was reached, one of the members of the SHPs group—United Healthcare Corporation—attempted to withdraw from the Settlement, resulting in additional litigation and further delay of the resolution of this case.

In short, the litigation has been more than sufficiently lengthy and complex to justify the requested amount of attorneys' fees.

> e.    *Risk of Nonpayment*

The risk of nonpayment in this matter was not negligible.  Counsel began this litigation in 2006 on a contingent fee basis.  See In re Flonase, 291 F.R.D. at 104 ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial.  Throughout this lengthy litigation, Class Counsel have not received any payment.  This factor supports approval of the requested fee.").  Over the next twelve years, Class Counsel devoted extensive amounts of time and resources to litigating this case, all while pursuing complex legal theories which brought with them no guarantee of recovery at trial.  Even in the event of recovery, the EPPs faced the substantial likelihood of challenge on appeal.  The risk of nonpayment was then significantly heightened by

the denial of class certification.  Given Class Counsels' diligent pursuit of this case for more than

a decade with significant risk and no immediate financial reward in sight, I find that this factor

weighs in favor of the requested fee award.

<em>f.      Amount of Time Devoted to the Case by Counsel</em>

According to the Declaration submitted in support of Class Counsels' Motion for

Attorneys' Fees, Class Counsel has spent 41,000 hours prosecuting of this case, all without any

guarantee of payment.  (Meltzer Decl. ¶¶ 46–52 & Exs. 6, 7, 8 & 10.)  Such expenditure of time

at such great risk warrants the requested 33 1/3 % fee award.  See In re Ikon Office Solutions, Inc.,

Secs. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) (granting a 30% fee request because "[c]ounsel

expended more than 45,000 hours on this case and paid out expenses of more than $4 million with

no guarantee of recovery" and the case presented "the legal obstacles of establishing scienter,

damages, causation, and the like."); Cullen, 197 F.R.D. at 149–50 (finding that counsel's

expenditure of 3,899.84 hours on litigation represented a "substantial commitment to this

litigation" that warranted a counsel fee of 33 1/3 % of the settlement fund); Wallace v. Powell,

288 F.R.D. 347, 375 (finding that counsel's expenditure of 34,900.48 hours on prosecuting the

matter reflected a "substantial commitment to this litigation" and "the complexity of Plaintiffs'

claims").

<em>g.      Awards in Similar Cases</em>

"While there is no benchmark for the percentage of fees to be awarded in common fund

cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery

cases generally range from nineteen to forty-five percent of the common fund."  Stevens v. SEI

Invs. Co., No. 18-4205, 2020 WL 996418, at *12 (E.D. Pa. Feb. 26, 2020) (citing G.M. Trucks,

55 F.3d at 822).  Courts have consistently approved such awards.  See, e.g., Myers v.  Jani-King

of Philadelphia, Inc., No. 09-1738, 2019 WL 4034736, at *11 (E.D. Pa. Aug. 26, 2019) (citing cases and noting that "the requested fee of one-third (1/3) of the settlement amount is reasonable in comparison to awards in other cases."); In re Fasteners Antitrust Litig., No. 08-md-1912, 2014 WL 296954, at *7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions) (citing cases); Stagi v. Nat'l R.R. Passenger Corp., 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (noting that this District's fee awards generally range between nineteen and forty-five percent of the common fund); In re Merck & Co., Inc. Vytorin Erisa Litig., No. 08-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) ("review of 289 settlements demonstrates "average attorney's fee percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); SmithKline Beecham Corp., No. 00-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (approving 30% fee of the $65 million settlement in pharmaceutical antitrust class action); In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action).

Given the magnitude of this case, the efforts of Class Counsel, the risks borne, and the positive outcome, I find that the requested fee of 33 1/3 % recovery remains consistent with the awarded fee in other, similar cases.

> h.   *Value of Benefits Accruing to Class Members Attributable to the Efforts of Class Counsel as Opposed to the Efforts of Other Groups, Such as Government Agencies*

A significant factor to consider is whether Class Counsel was aided by a government investigation.  In re AT&T Corp., 455 F.3d 160, 173 (3d Cir. 2005).  "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable

principles which underline the concept of the common fund, and would create an incentive for plaintiffs[s] attorneys to 'minimize the costs of failure . . . by free riding on the monitoring efforts of others.'"  In re Prudential, 148 F.3d at 337 (further quotations omitted).

Here, the EPPs filed suit almost two years before the Federal Trade Commissions ("FTC") initiated suit in FTC v. Cephalon, Inc., Civ. A.  No. 08-2141 (Feb. 13, 2008).  Prior to the FTC suit, the EPPs had already engaged in their own investigation of the Provigil market and developed their own antitrust theories regarding the reverse-payment settlements between Cephalon and the generic modafinil manufacturers.  Class Counsel were subsequently able to coordinate discovery and the exchange of information with other classes and claimants, including the FTC, generic manufacturer Apotex, a group of large pharmacy chains, a direct purchaser class, and a group of state attorneys general.  Such cooperation, however, does not detract from the exorbitant time and effort expended by Class Counsel on this matter and does not impact the percentage fee to which they are entitled.

> i.    *The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Agreement at the Time Counsel Was Retained*

"In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts.  That is, we must consider 'the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.'"  In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008) (quoting AT & T, 455 F.3d at 165).  While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.'"  In re Linerboard Antitrust Litig. ("Linerboard II"), 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting In re

Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)).  "[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.  In re Ikon Office Solutions, 194 F.R.D. at 194 (E.D. Pa. 2000); see also In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 WL 3008808, at *16 (D.N.J. 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.")

The requested fees here fall squarely within that range, as Class Counsel seeks an award of 33 1/3% of the Settlement Fund.  Therefore, this factor supports the requested fees.

### j.    Innovative Terms of Settlement

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.'"  In re Prudential, 148 F.3d at 339 (quotations omitted).  Such a finding may be warranted where a settlement involved "innovative" or unique terms.  Id. (describing the findings of the lower court regarding plaintiffs' counsels' work on the settlement, including "the availability of full compensatory relief, the extensive and comprehensive outreach, and the multi-tiered review process designed to ensure fair scoring of claims," among other characteristics).

Nothing in the Settlement here is particularly remarkable or innovative.  Accordingly, there is no indication that this factor should bear on an attorney fee award.

### k.    Overall Review of the Gunter and Prudential Factors

All of the Gunter and Prudential factors—except one, which weighs neither for nor against approval—supports the award of an attorneys' fees in the amount of 33 1/3 % of the Settlement. Taking them as a whole, I find that the scale is heavily tipped in favor of the requested attorneys' fee award.

2.      Cross-Check Against Class Counsels' Lodestar

The Third Circuit has suggested that it is "sensible" for district courts to cross check the percentage fee award against the "lodestar" method.  In re Rite Aid, 396 F.3d at 305.  The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys.  Id.  The court must then use a multiplier, which is a device that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."  Id. at 305–06.  "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  Id. at 306.  Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case."  In re Prudential, 148 F.3d at 340–41.

Here, as noted above, Class Counsel spent 41,000 working on this case on behalf of the class, which hours included preparing the initial Complaint and the Consolidated Amended Class Action Complaint, conducting legal research, engaging in extensive discovery, briefing multiple motions or responses to motions for summary judgment, pursuing class certification, engaging and working with experts, preparing for trial, and pursuing settlement negotiations and settlement document drafting.  (Meltzer Decl. ¶¶ 50, 52 & Exs. 6–8.)  In addition, Class Counsel will undoubtedly need to spend additional hours in order to monitor and administer the Settlement and final closing of this case.

Rates for counsel appear to be well within the reasonable range for Counsels' experience and for the region.  At the firm of Spector Roseman and Kodroff, rates ranged from $140 per hour for a paralegal to $880 per hour for the most senior partner, with a great deal of the work being

done at the contract attorney level.  (Meltzer Decl., Ex. 6.)  At the firm of Criden & Love, rates ranged from $425 per hour for an associate to $800 for a partner.  (Meltzer Decl., Ex. 7.)  Finally, at the firm of Finkelstein Thompson LLP, rates ranged from $150 for a law clerk, and $220 for a paralegal, to $850 for a partner.  (Meltzer Decl., Ex. 8.)  The rates of the lawyers from the two assisting firms are consistent.  (Meltzer Decl., Exs. 9 & 10.)

Courts have considered similar rates reasonable in the past.  Fulton-Green v. Accolade, Inc., No. 18-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); In re Viropharma Inc., Sec. Litig., No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys."); In re Avandia Mktg., Sales Practices and Prods. Liab. Litig., No. 07-1871, 2012 WL 6923367, at * 10 (E.D. Pa. Oct. 19, 2012) (concluding a top hourly rate of $595 was "particularly reasonable in comparison" to the hourly rates of top Philadelphia firms).

Multiplying the reasonable hours by the reasonable hourly rates yields a total lodestar of $22,823,274.  Where there has been a class settlement, this lodestar "is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered."  Brown v. Esmor Corr. Servs., No. 98-1282, 2005 WL 1917869, at *13 (D.N.J. Aug. 10, 2005); see also In re Prudential, 148 F.3d 283, 340 (3d Cir. 1998) ("Multipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result.").  The Third Circuit has recognized that lodestar multipliers from one to four "are frequently awarded" in class cases.  In re Prudential Ins. Co., 148 F.3d at 341 (citing 3 Herbert Newberg & Albert Conte, Newberg on Class Actions § 14.03 at 14-5 (3d ed. 1992)).

Here, no such multiplier is necessary as the lodestar amount is even higher than the $21,959,200 percentage-of-recovery amount sought here.   In other words, Class Counsel is requesting less than their total lodestar, making it within the accepted range in the Third Circuit.

> 3.      Conclusion as to Attorneys' Fees

Having thoroughly considered all of the <u>Gunter</u> and <u>Prudential</u> factors and having cross-checked the requested fee against the lodestar amount, I find nothing that would warrant denying or reducing the fee requested by Class Counsel.   Indeed, by all measures, the requested fee is fair, reasonable, and commensurate with the skill of the attorneys, the amount of work they expended on this complicated litigation, and the results they achieved.   Accordingly, I will grant attorneys' fees in the amount of $21,959,200.

## B.      **Reasonable Litigation Expenses**

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action."   <u>In re Safety Components, Inc. Sec. Litig.</u>, 166 F. Supp. 2d 72, 108 (D.N.J. 2001); <u>Careccio v. BMW of N. Am. LLC</u>, No. 08-2619, 2010 WL 1752347, at *7 (D.N.J. Apr. 29, 2010).   The court must consider whether the expenses were adequately documented and reasonably and appropriately incurred in the prosecution of the case.   <u>Demmick v. Cellco P'ship</u>, No. 06-2163, 2015 WL 13646311, at *4 (D.N.J. Apr. 30, 2015)

Class Counsel here has adequately documented their expenses, which include, among other things, litigation fund, professional fees (expert, investigator, accountant, etc.), computer research, copying, travel, court fees, and phone and messenger services.   (Meltzer Decl., Exs. 6–10.)   During the Final Fairness Hearing, I questioned counsel on the nature of the "litigation fund" expense, and Class Counsel adequately explained that it was a fund of money donated by each participating

Class Counsel firm from which day-to-day expenses were drawn.  Finding that these expenses were appropriately incurred in the prosecution of the class action, I award Class Counsel the requested fees in the amount of $2,663,468.

### C.    Class Representative Incentive Awards

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class."  McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (quotations omitted).  Generally, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); see also First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 524–25 (E.D. Pa. 2007) (citing Nichols v. SmithKline Beecham Corp., No. 00-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint Co., No. 01-5639, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)).  Factors to be considered when deciding to give incentive awards include "the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class."  McGee v. Ann's Choice, Inc., No. 12-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (citing In re Plastic Tableware Antitrust Litig., No. 94-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995)).

Here, Class Counsel requests incentive awards in the amount of $15,000 for Consumer Plaintiff Shirley Paneianco, and $50,000 for each of the four TPP Plaintiffs, Vista Healthplan, Inc.

(n/k/a Coventry Health Care of Florida, Inc.), District Council 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission, all of which are to be paid from the Class Settlement Fund.  Class Counsel note that each of the five named Plaintiffs provided significant assistance to the case, including responding to written discovery, producing documents, and sitting for a deposition by Defendants.  In addition, each named Plaintiff actively monitored the litigation and reviewed the Complaint and other substantive pleadings.  Finally, the named Plaintiffs participated in mediation talks and were responsible for reviewing and approving the Settlement.

As noted by the EPPs, these requested incentive awards fall in line with those that have been approved in other cases.  See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving $100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives); Drywall, No. 13-md-2437, 2018 WL 3439454, at *20 (E.D. July 17, 2018) (approving incentive awards to the four named Plaintiffs in the amount of $50,000); Marchbanks Truck Serv. v. Comdata Network, Inc., No. 07-1078, 2014 WL 12738907, at *3–4 (E.D. Pa. July 14, 2014) (awarding incentives in the amount of $150,000 to one class representative, $75,000 each to two others, and $15,000 to the fourth).

For these reasons, I will grant the requested incentive awards of $15,000 to Shirley Panebianco, and $50,000 to the three TPP Class Representatives.

## VII.    CONCLUSION

In light of the foregoing, I will certify the Settlement Classes set forth above and grant Final Approval to the Settlement.  I will further appoint interim Class Counsel as Class Counsel, and approve the Plan of Allocation.  In addition, I will (a) award End-Payor Co-Lead Counsel for

the Settlement Classes attorneys' fees in the amount of $21,959,200, plus one-third of the accumulated interest on the Class Settlement Fund; (b) reimburse Class Counsel $2,663,468 in litigation costs and expenses; and (c) award Consumer Plaintiff Shirley Panebianco an incentive award of $15,000, and each TPP Plaintiff—Vista Healthplan, Inc. (n/k/a Coventry Health Care of Florida, Inc.), District Counsel 37 Health & Security Plan, Pennsylvania Employees Benefit Trust Fund, and Pennsylvania Turnpike Commission—an incentive award of $50,000 to be paid from the Class Settlement Fund.

An appropriate Order follows.